ALICE BOWEN *vs.* ELI LILLY & CO., INC.

Worcester. April 2, 1990. - August 6, 1990.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Limitations, Statute of. Negligence*, Pharmaceutical manufacturer.

Discussion of the "discovery rule" for determining when a cause of action accrues, as applicable to the question whether the notice a plaintiff had of the cause of her physical harm was sufficient to commence the running of the statute of limitations on her claim against a pharmaceutical manufacturer. [205-208]

In a tort action against a pharmaceutical manufacturer, the record in summary judgment proceedings established that a reasonable person in the plaintiff's position would have been on notice, more than three years before commencing her action, that her mother's ingestion during pregnancy of a certain prescription drug, manufactured by the defendant, may have caused the plaintiff's cancer; consequently, the claim was barred by the statute of limitations. [208-211]

CIVIL ACTION commenced in the Superior Court Department on March 23, 1983.

The case was heard by *William C. O'Neil, Jr.*, J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John F. Keenan*, for the plaintiff.

*Loretta M. Smith* (*Marshall Simonds* with her) for the defendant.

WILKINS, J. The defendant argues that the plaintiff's negligence claim is barred because she commenced this action more than three years after her cause of action accrued. G. L. c. 260, § 2A (1988 ed.). A judge in the Superior Court agreed and allowed the defendant's motion for summary

judgment. We transferred the plaintiff's appeal here on our own motion and now affirm the judgment.[1]

We summarize the undisputed record facts. During her pregnancy with the plaintiff, the plaintiff's mother took the prescription drug diethylstilbestrol (DES) to prevent a threatened miscarriage. The plaintiff was born on April 14, 1948. In 1969 the plaintiff underwent an operation for a malignant vaginal tumor, during which a colostomy was performed as well as a radical hysterectomy. The complaint in this action was filed approximately fourteen years later on March 23, 1983. The question is whether, on the summary judgment record, there is a dispute of material fact as to whether the three-year statute of limitations had run before this action was commenced.[2]

This court has recognized the unfairness of a rule that holds that the statute of limitations has run even before a plaintiff knew or reasonably should have known that she may have been harmed by the conduct of another. We, therefore, have developed (in the absence of a governing statute) a discovery rule for the purpose of determining when a cause of action accrues, and thus when the statute of limitations starts to run. This rule prescribes as crucial the date when a plaintiff discovers, or any earlier date when she should reasonably

---

[1]A separate claim based on breach of warranty was also decided against the plaintiff in part because there was no privity of contract between the plaintiff and the defendant. At the time of the plaintiff's injuries, lack of privity was a defense to a breach of warranty claim. See *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 34-36 (1977). The plaintiff has not appealed from that ruling.

[2]We treat as properly part of the summary judgment record documents that the plaintiff produced in response to a court order erroneously entered and later revoked. The judge who decided the summary judgment question was asked to reconsider the question and implicitly ruled that the documents were a proper subject of a motion to produce. He was correct.

The claim, raised for the first time on appeal, that an affidavit referring to attached documents, signed by an attorney for the defendant, failed to comply with Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974), lacks merit. The attached documents were portions of deposition transcripts and documents produced by the plaintiff.

have discovered, that she has been harmed or may have been harmed by the defendant's conduct.

We first adopted the discovery rule in *Hendrickson* v. *Sears*, 365 Mass. 83, 83-84 (1974). There we held that, if an attorney's negligent title search overlooked an easement of record and the title defect was, in the circumstances, inherently unknowable by his clients, their cause of action against him did not accrue until they discovered or should reasonably have discovered the attorney's misrepresentation concerning the record title. *Id.* at 90-91. We declined to apply the rule, then applicable to medical malpractice claims, that the statutory period began to run when the negligent act occurred, even if the plaintiff could not reasonably ascertain the harm until later. *Id.* at 86, citing *Capucci* v. *Barone*, 266 Mass. 578, 581 (1929). Two years after the *Hendrickson* case, we applied the discovery rule to claims of fraudulent misrepresentations in the sale of real estate. *Friedman* v. *Jablonski*, 371 Mass. 482, 485 (1976). We recognized that, when the plaintiffs claimed a misrepresentation concerning the existence of a right of way over other property, the plaintiffs had certain obligations of reasonable inquiry and that the decision whether any misrepresentation should reasonably have been uncovered had to be made in light of what reasonable inquiry would have disclosed. *Id.* at 485-486. We concluded that by the time the plaintiffs took title to the property, reasonable inquiry would have shown that there was no right of way, and thus the statute of limitations began to run at that time. *Id.*

We extended the discovery rule to medical malpractice actions, thus overruling *Capucci* v. *Barone*, *supra*, in *Franklin* v. *Albert*, 381 Mass. 611, 618-619 (1980). We said that medical malpractice "causes of action accrue when the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant's conduct." *Id.* at 619. The principle thus stated does not require that the plaintiff know or have reason to know that the defendant violated a legal duty to the plaintiff, but only that she knew or had reason to know that she had been harmed by the defendant's conduct.

See *White* v. *Peabody Constr. Co.*, 386 Mass. 121, 130 (1982) ("The 'notice' required is not notice of every fact which must eventually be proved in support of the claim"); *Fidler* v. *Eastman Kodak Co.*, 714 F.2d 192, 198-199 (1st Cir. 1983) (Massachusetts law). The plaintiff need not know the full extent of the injury before the statute starts to run. *Olsen* v. *Bell Tel. Laboratories, Inc.*, 388 Mass. 171, 175 (1983). The important point is that the statute of limitations starts to run when an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury. See *Franklin* v. *Albert*, *supra* at 618.

This case presents an aspect of the discovery rule with which this court has not previously been confronted. Our prior cases have focused on the question whether, in given circumstances, the plaintiffs should reasonably have discovered that they had been harmed. In each of these cases, there was no significant doubt concerning the cause of the harm once the plaintiffs discovered it. In this case, on the other hand, the plaintiff was always well aware that she had sustained substantial physical harm. The question is whether she was sufficiently on notice as to the cause of her physical harm.

Construing Massachusetts law, the Court of Appeals for the First Circuit in 1983 faced the question of the level of notice of causation a plaintiff must have to trigger the running of the statute of limitations. *Fidler* v. *Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir. 1983). The Court of Appeals said: "Defining how much notice of cause is enough notice is inherently problematic where, as here, establishment of actual causation is itself an issue to be resolved at trial on the merits. If cause were defined in its strictest sense, a cause of action would never accrue for purposes of the statute until cause, when at issue, had been resolved at trial. See *Dawson* v. *Eli Lilly Co.*, 543 F. Supp. 1330, 1334 (D.D.C. 1982). Such a definition would entirely defeat the purposes of a statute of limitations in this class of cases, and we know of no court which has gone so far." *Id.* at 198. The court con-

cluded "that under Massachusetts law notice of likely cause is ordinarily enough to start the statute running. Thus on notice, the potential litigant has the duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim." *Id.* at 199.

The plaintiff argues that the reference to "notice of likely cause" in the quoted language means that a plaintiff must have probable cause to believe that the defendant's acts were the cause of her physical injuries before the statute begins to run. There is no Massachusetts case law in support of this view. The Court of Appeals opinion does not adopt that position. Our Appeals Court did not read the Court of Appeals opinion as the plaintiff claims when it said: "Massachusetts does not require discovery of each of the elements of the cause of action — duty, breach, causation, and damages before the limitation clock in G. L. c. 260, § 4 starts ticking. . . . Rather, the three-year limitations period commences to run when a reasonably prudent person (in the tort claimant's position), reacting to any suspicious circumstances of which he might have been aware (what the Court of Appeals in *Fidler* called 'likely cause'), should have discovered that he had been harmed by his physician's treatment." (Citations and footnote omitted.) *Malapanis* v. *Shirazi*, 21 Mass. App. Ct. 378, 382-383 (1986). We do not require that a plaintiff have notice of a breach of a duty before a cause of action may accrue, but we do require that a plaintiff have (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was.

We shall now turn to the summary judgment record to see whether a reasonable person in the position of the plaintiff would have been on notice that her mother's ingestion of DES may have caused the plaintiff's cancer. Whether in a given case there was significant notice of causation depends on the facts. We conclude that the plaintiff had such direct information bearing on the cause of her cancer that the statute of limitations ran before this action was commenced.

After the 1969 operation on the plaintiff, at the request of the operating surgeon, the plaintiff and her mother met with Dr. Arthur L. Herbst, a medical researcher. Dr. Herbst asked them many questions, including questions about what medication the plaintiff's mother may have taken during pregnancy. Her mother told Dr. Herbst in the plaintiff's presence that she had taken DES. On April 15, 1971, Dr. Herbst wrote a letter to the plaintiff's mother, which the plaintiff, then twenty-three years old, read. In that letter, Dr. Herbst stated that as a result of the study of women with vaginal tumors "we have found an important association" between the ingestion of DES by pregnant women and vaginal tumors in their daughters but it was "certainly not the sole cause" of the kind of cancer the plaintiff had had.[3]

In 1971, an article by Dr. Herbst and two other physicians was published stating that there was a statistically significant association between the ingestion of DES by pregnant women and the appearance of clear cell adenocarcinoma of the vagina in a small number of their daughters.[4] The article

---

[3]The substance of the letter states: "As I recently told you over the telephone, our study of girls with vaginal tumors has been completed. The results show that among the eight mothers of girls who developed this tumor, seven took the hormone, stilbestrol, starting early in pregnancy. It is important to realize that one mother took no hormones during pregnancy, and her daughter still developed a tumor. In summary, we have found an important association, but this is certainly not the sole cause of these tumors."

[4]The article, published in the New England Journal of Medicine, was entitled "ADENOCARCINOMA OF THE VAGINA" and subtitled "Association of Maternal Stilbestrol Therapy with Tumor Appearance in Young Women." An abstract of the article, appearing in bold print below its heading, reads as follows: "Adenocarcinoma of the vagina in young women had been recorded rarely before the report of several cases treated at the Vincent Memorial Hospital between 1966 and 1969. The unusual occurrence of this tumor in eight patients born in New England hospitals between 1946 and 1951 led us to conduct a retrospective investigation in search of factors that might be associated with tumor appearance. Four matched controls were established for each patient: data were obtained by personal interview. Results show maternal bleeding during the current pregnancy and previous pregnancy loss were more common in the study group. Most significantly, seven of the eight mothers of patients with carcinoma had been treated with diethylstilbestrol started during the first tri-

states that maternal ingestion of DES during early preg-
nancy "appears to have enhanced the risk of vaginal adeno-
carcinoma developing years later in the offspring exposed."
Dr. Herbst sent a copy of the article to the plaintiff's mother
in 1971, and the plaintiff read it. She knew the article was
"about me."

In 1972 the plaintiff began to keep a file of magazine arti-
cles that discussed the DES controversy. Among those arti-
cles was one dated February, 1976, written by a physician
and read at the time by the plaintiff, which stated that "[a]s
dozens of similar cases were reported, it became clear that
the culprit [i.e., the cause of the exceedingly rare vaginal
cancer] was [DES]."

We conclude that, on the summary judgment record, the
prospect of a significant causal connection between DES and
the plaintiff's cancer was brought to the plaintiff's attention
more than three years before this action was commenced.
The fact it was not until June, 1982, that the plaintiff be-
lieved that DES caused her cancer does not aid her because
we test the accrual of her cause of action by what a reasona-
ble person in her position would have known or on inquiry
would have discovered at the various relevant times. In this
case, the plaintiff was aware not only of numerous articles
published in the popular media but also she knew of scientific
opinion, based in part on the plaintiff's own circumstances,
stating that there was the prospect of a causal link between
DES and the rare vaginal cancer from which she suffered.

Reasonable notice that a particular product or a particular
act of another person may have been a cause of harm to a
plaintiff creates a duty of inquiry and starts the running of
the statute of limitations. On the undisputed facts, the plain-
tiff was on notice more than three years before this action
was begun in 1983 that DES consumed by her mother may

mester. None of the control group were so treated (p less than 0.00001).
Maternal ingestion of stilbestrol during early pregnancy appears to have
enhanced the risk of vaginal adenocarcinoma developing years later in the
offspring exposed." Herbst, A.L., & others, ADENOCARCINOMA OF
THE VAGINA, 284 New Eng. J. Medicine 878 (April 22, 1971).

In *Forster* v. *R.J. Reynolds Tobacco Co.*, *supra*, the Supreme Court of Minnesota declared that a claim of intentional misrepresentation brought against a cigarette manufacturer was not preempted by the Cigarette Labeling Act, despite the fact that the claim depended upon allegations which included the manufacturer's advertising activities. *Id.* at 662. The court based its decision on a finding that the cause of action "[did] not lie in challenging the adequacy of the federal warning [or] in claiming a dilution of that warning." *Id.* With reference to the plaintiff's claim of intentional misrepresentation, the Minnesota Supreme Court stated that, "[t]o find in this situation an implied preemption, we would have to assume that Congress intended the Act to be a license to lie, an assumption both uncharitable to Congress and violative of this state's deep concern for honesty as well as health." *Id.* at 662. In so far as the plaintiff's claim did not implicate a claim of a breach of a duty to warn, it was allowed to proceed. *Id.*

I, too, am unwilling to ascribe to Congress the intent to provide cigarette producers "a license to lie." Such a result is not compelled by the Cigarette Labeling Act's preemption of claims based on a duty to warn, and is incompatible with the long-standing rule that a court must guide its preemption analysis according to the "overriding presumption that 'Congress did not intend to displace state law.'" *Cipollone* v. *Liggett Group, Inc.*, 789 F.2d at 185, quoting *Maryland* v. *Louisiana*, *supra* at 746. The Minnesota case, with its scenario of "a license to lie," provides a clear example of but one of the extreme positions this State would have to accept were it to

---

tivity. *Id.* at 582. However, the Eleventh Circuit has yet to indicate its acceptance or rejection of the decision in *Cipollone II*.

I note as an interesting sidelight that in *Cipollone II* the Third Circuit held that the plaintiff's risk-utility claim was not preempted. *Id.* at 582 n.52. The cigarette manufacturer in that case had argued that the risk-utility claim called into question cigarette advertising and promotional activity. *Id.* The court, however, disagreed, stating that the risk-utility claim "involves the basic decision to market the product." *Id.*

insulate all cigarette advertising activity from scrutiny under State law.

2. *State law claims.* The judge denied Philip Morris's motion for summary judgment as to each of the plaintiffs' four claims. It seems clear on this record that the focus of the judge's decision was the issue of the survival of the plaintiffs' claims under Federal preemption analysis, and not, as the court suggests, as a ruling on matters of State law. I come to this conclusion primarily because the judge's order anticipated "considerable discovery" should his denial of the motion for summary judgment be upheld on appeal. Had the judge's decision focused on the State law claims, it seems logical to me that he would have considered discovery to have been substantially completed on these issues. His discussion of "considerable" future discovery suggests that such was not the case. See *Kauffman* v. *Puerto Rico Tel. Co.*, 841 F.2d 1169, 1172 (1st Cir. 1988) (summary judgment generally should not enter unless there has been adequate time for discovery).

a. *Civil conspiracy.* The plaintiffs allege that Philip Morris entered into a conspiracy with Store 24 and "diverse unknown distributors of Parliaments and Marlboros" to sell cigarettes to minors in the Commonwealth. The plaintiffs claim that, pursuant to an express or implied agreement to combine with Store 24 and unknown distributors to increase sales of Parliament and Marlboro to minors, Philip Morris engaged in concerted action intended to further the designs of the conspiracy. Such action was described in the complaint as "including but not limited to marketing practices [designed to increase the attractiveness of Parliament and Marlboro to minors and] the continuing distribution of Parliament and Marlboro to defendant The Store 24, Inc. over time while possessing actual knowledge that said retail defendant was engaging in a pattern and practice of selling said Parliament and Marlboro to minors in violation of M. G. L. ch. 270 § 6."

In order to establish liability under a concert of action theory, the plaintiffs must establish that there was an express or

implied agreement between Philip Morris and Store 24 to sell cigarettes illegally to minors. *Gurney* v. *Tenney*, 197 Mass. 457, 466 (1908). *Payton* v. *Abbott Labs*, 512 F. Supp. 1031, 1035 (D. Mass. 1981). The plaintiffs argue that an agreement may be inferred from the conduct of Philip Morris and Store 24, in which Store 24 sold cigarettes to minors and Philip Morris, with knowledge of the illegal sales, continued to supply Store 24 with cigarettes and undertook a marketing campaign designed to encourage minors to buy cigarettes.

This court has recognized that an agreement may be inferred due to the concerted action of the parties. See *Commonwealth* v. *Taber*, 350 Mass. 186 (1966); *Orszulak* v. *Bujnevicie*, 355 Mass. 157 (1969); *Nelson* v. *Nason*, 343 Mass. 220 (1961); *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 494 (1921). In one of the cases cited by the plaintiffs, *Direct Sales Co.* v. *United States*, 319 U.S. 703 (1943), cited with approval by this court in *Commonwealth* v. *Taber*, *supra* at 187, the United States Supreme Court sustained a conspiracy conviction, holding that an agreement to sell drugs illegally could be inferred between a mail-order pharmaceutical business and a physician who falsified prescriptions in order illegally to sell morphine purchased from the mail-order business. In *Direct Sales*, *supra*, the Court relied upon the fact that (1) morphine is a restricted commodity, (2) the mail-order business encouraged high quantity sales, and (3) the mail-order business, despite being warned by the Bureau of Narcotics that it was being used as a source of supply by convicted physicians, continued to sell to the physician in question, on a daily basis, an amount of morphine equivalent to that prescribed by the average physician over the course of one year. *Id.* at 706-712.

For the purposes of the motion for summary judgment, the judge was entitled to conclude that Philip Morris's marketing and advertising activity, in conjunction with Store 24's illegal sale of cigarettes to minors, demonstrated a sufficient connection between Philip Morris and Store 24 to raise a genuine dispute as to the existence of an inferred agreement between

them. The plaintiffs' complaint claims that various "unknown distributors of Parliaments and Marlboros" are involved in a conspiracy with Philip Morris and Store 24. Regarding this point, the judge found that Philip Morris has conceded that a genuine factual dispute exists as to several facts, including whether "[a] pattern and practice of illegal retail sales of Marlboros to minors . . . exists in the Commonwealth." Additionally, as the judge's report stated, discovery had not yet been completed on this and other issues.

If the plaintiffs could show that the "pattern and practice" they alleged includes some concerted action between Philip Morris, the independent distributors, and Store 24, this could support an inference of an agreement between Philip Morris and Store 24. "It is not essential to a conspiracy that the parties meet or that they confer and formulate their plans. Common purpose may be inferred from concerted action converging to a definite end." *Attorney Gen.* v. *Tufts, supra* at 494. See *Commonwealth* v. *Taber, supra* at 186, 187. The existence of an agreement is a fact which is material to the resolution of a conspiracy claim. See *Gurney* v. *Tenney, supra* at 466.

In my view, the court should not rule that, based on the record before him, the judge erred in concluding that the plaintiffs should be allowed an opportunity to produce additional evidence to suggest a more concrete connection between the actions of Philip Morris and the alleged illegal activity of Store 24. Philip Morris was not entitled to summary judgment on the conspiracy count of the complaint.[3]

b. *Negligent entrustment.* In their complaint, the plaintiffs allege that Philip Morris, by knowingly encouraging sales of Parliament and Marlboro to minors and by failing to take affirmative action to prevent Store 24 from selling these cigarettes to minors, created an unreasonable risk of injury and negligently breached its common law duty not to entrust a

---

[3]The civil conspiracy claim does not implicate either the adequacy of the warning label required by the Cigarette Labeling Act or Philip Morris's duty to warn of the health hazards of its product. Accordingly, no part of the plaintiffs' civil conspiracy claim is preempted.

dangerous instrumentality to a minor. The plaintiffs' claim of negligent entrustment is based on "the general rule that a person may be found negligent for furnishing a dangerous instrumentality to a child who uses it to cause harm, since 'the serious consequences which [follow] ought to have been foreseen and guarded against.' " *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 10 n.4 (1983), quoting *Pudlo* v. *Dubiel*, 273 Mass. 172, 175 (1930).[4]

In order to establish liability for negligent entrustment of a dangerous instrumentality, the plaintiffs must prove, among other things, "that the defendant owned or controlled the [instrumentality] concerned." *Alioto* v. *Marnell*, 402 Mass. 36, 40 (1988), quoting *Leone* v. *Doran*, 363 Mass. 1, 7 (1973). If the plaintiffs were allowed to establish that Philip Morris entered into a conspiracy with Store 24 to sell cigarettes to minors, a jury reasonably could conclude that Philip Morris was able to exert some measure of control over the cigarettes. Whether this control rose to the level required to prove that Philip Morris "entrusted" cigarettes to minors would have been an issue for the jury. Because the judge found that further discovery may be necessary to flesh out the factual basis for the plaintiffs' allegations concerning Philip Morris's involvement in the alleged "pattern and practice" of illegal sales of cigarettes to minors, the court should not rule that the judge erred in denying the defendant summary judgment as to the plaintiffs' negligent entrustment claim.

Regarding the issue of actual knowledge of the plaintiffs' incompetence, it is evident from the provisions of G. L. c. 270, § 6, that the Legislature has determined that *all* minors, without the aid of a parent or guardian, are incompe-

---

[4]An action for negligent entrustment involves a person's duty to keep a dangerous instrumentality out of a child's reach, and would lie regardless of the adequacy of any warnings provided to the child regarding the dangers presented by the use of the instrumentality. Because Philip Morris's duty to warn of the hazards of its product is not implicated by the negligent entrustment claim, no portion of the claim is preempted by the Cigarette Labeling Act.

tent to make the decision whether or not to smoke cigarettes. Therefore, sellers or suppliers of cigarettes are prohibited from providing cigarettes to minors in the Commonwealth.[5] This legislative determination, incorporated into the plaintiffs' complaint by their reference to G. L. c. 270, § 6, provided a sufficient basis for the judge to conclude that the plaintiffs, who were minors at the time they purchased Philip Morris cigarettes, had raised a genuine dispute whether Philip Morris, "by inference or otherwise . . . had actual knowledge of the [plaintiffs'] incompetence." *Leone* v. *Doran, supra* at 13 n.3.

Because the plaintiffs have raised genuine issues of material fact concerning their allegation of negligent entrustment and as to their civil conspiracy claim, summary judgment was appropriately denied as to these counts of the complaint. Accordingly, I dissent from that part of the court's opinion which grants Philip Morris summary judgment.

---

[5] A violation of this statute will serve as evidence of the negligence of the seller or supplier in entrusting a dangerous instrumentality to a minor. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc., supra* at 10 (violation of a statute prohibiting provision of alcoholic beverages to minors can serve to establish negligence).

## Commonwealth *vs.* Daniel G. Gagnon.

Suffolk. May 9, 1990. - July 30, 1990.

Present: Liacos, C.J., Abrams, Nolan, O'Connor, & Greaney, JJ.

*Evidence*, Impeachment of credibility, Relevancy and materiality, Cross-examination, Bias, Hearsay, Declaration against interest. *Homicide. Practice, Criminal*, Instructions to jury, Judicial discretion, Required finding, Capital case. *Due Process of Law*, Declaration against interest. *Constitutional Law*, Confrontation of witnesses, Self-incrimination. *Witness*, Self-incrimination. *Conspiracy. Burning of Property.*

At a murder trial in which a defense witness testified that a certain individual had admitted to him that he, and not the defendant, had shot the victim, no prejudicial error appeared in the judge's allowing the prosecutor to cross-examine the witness in order to demonstrate that his testimony was a recent contrivance, to suggest the witness's bias, and to impeach the witness's credibility. [190-193]

At a murder trial there was no error in the judge's giving, on her own initiative during the testimony of a certain defense witness, an instruction to the jury on their function in determining the credibility of the evidence. [193-194]

Where a criminal defendant sought to call a witness to the stand solely in order for the witness to invoke his privilege under the Fifth Amendment to the United States Constitution not to testify before the jury, the judge correctly ruled that the witness could not be presented; the defendant's rights to produce evidence under the Sixth Amendment or under art. 12 of the Declaration of Rights of the Massachusetts Constitution were not implicated, as calling that witness to the stand would not produce any relevant evidence. [194-198]

At a murder trial no error was demonstrated in the judge's admitting in evidence a .38 caliber cartridge case found on a shelf in the defendant's bedroom, four days after the shooting, which was of a type consistent with that of the projectile recovered from the victim's body. [199-200]

Evidence at a criminal trial was sufficient to permit a finding of a conspiracy between the defendant and another to burn a motor vehicle. [200-202]

INDICTMENTS found and returned in the Superior Court Department on December 16, 1986.

The cases were tried before *Sandra L. Hamlin*, J.

*William P. Homans, Jr.*, for the defendant.

*Sharon B. Soffer*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree, unlawfully carrying a firearm, and conspiracy to burn a motor vehicle. On appeal, the defendant claims error in (1) the examination of John Butler, a defense witness who testified that Louis Marotta had admitted that he, not the defendant, had shot the victim; (2) the judge's rulings in connection with defense counsel's efforts to show before the jury that Marotta had claimed his privilege against self-incrimination, to comment on Marotta's absence as a witness, or to show that Marotta had been nonresponsive to a subpoena to testify at the trial; and (3) the admission in evidence of a spent cartridge. The defendant also claims that there was insufficient evidence to convict him of the conspiracy charge. We reject the defendant's claims and affirm the convictions. We also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E (1988 ed.), to direct the entry of a verdict of a lesser degree of guilt or to order a new trial in connection with the murder conviction.

The Commonwealth presented evidence to the jury of the following. In the early evening of September 28, 1986, the victim, a thirteen year old boy, was sitting with two friends, Paul Carpenter,[1] thirteen, and Michael Vincent, eleven, on the front porch of Carpenter's home in Revere. A fourth boy, eight year old Michael Bruno, was leaning against a gray Chrysler automobile parked in front of the house. A man approached Bruno and told him "to get off his car." Carpenter testified that he recognized this man as the defendant, whom he believed to be the stepfather of another boy who lived on

---

[1] We have assigned fictitious names to the boys involved in the case.

the street. The defendant then got into his car and drove away.

A few minutes later, Carpenter, Vincent, and the victim walked across the street to do "pull-ups" on a fence. As they approached an alley between two houses, the boys encountered the defendant and another man, later identified as Louis Marotta. Carpenter described Marotta as approximately five feet eight inches tall, heavy set, dark haired, and shorter than the defendant. Carpenter described the defendant as having a beard and moustache, while Marotta had no facial hair. Vincent described the defendant as about six feet tall, thin, with brown hair, moustache, and beard. The defendant asked the boys if they had been throwing rocks at Marotta's car, which they denied.

At that point a neighbor, Lisa Wilson, arrived at the scene and asked what was going on. Wilson testified that the taller of the two men, neither of whom she recognized, told her that the boys had been throwing rocks at a car. Wilson described this man as having blondish hair and a moustache. After the boys again denied throwing the rocks, Wilson turned and started walking home.

As she turned to walk home, Wilson heard the taller man say, "You think it's funny? I'll blow your f'n brains out."[2] Vincent testified that the defendant said "that he was going to blow our brains out," and both Vincent and Carpenter reported hearing the defendant ask, "Do you want me to kill you with my hands or with a gun?"[3] The defendant then raised his hand to the victim's face and shot him just beneath the left eye.

With regard to more particular detail, both Vincent and Carpenter testified that they saw the defendant shoot the victim. Vincent stated that he saw the defendant with a gun in his hand, and as he ran away, turned and observed the

---

[2] Although she did not see which man made this threat, Wilson recognized the voice as that of the taller man, who, she testified, had done most of the talking and yelling previously.

[3] None of these witnesses reported hearing Marotta make any threat.

"flash" of the gun and the victim fall to the ground. Carpenter testified that he saw the defendant "put his hand next to [the victim's] face" when he saw a "flash" and the victim fall to the ground. Carpenter then saw the defendant flee the scene with Marotta close behind him. This is the primary evidence on which the Commonwealth relied. We shall relate additional facts and evidence, including the evidence pertaining to the defendant's conviction for conspiracy to burn a motor vehicle, as we discuss the various claims of error.

1. *Examination of John Butler.* The defendant contended at trial that Louis Marotta had shot the victim. To support that contention, he called as a witness John Butler. Butler testified on direct examination that he had met a man known to him as "Louis" through his (Butler's) former girl friend, Mary Quish, and that he had seen "Louis" occasionally over a six-year period. Butler indicated that he read a news article contained in the Thursday, January 14, 1988, edition of the Boston Herald newspaper. That article (which was admitted in evidence) described the start of the trial and the opening statements of counsel. In particular, the piece stated that defense counsel had told the jury that the defense "would prove [that the defendant's] cohort, twenty-three year old Louis Marotta, Junior of Hyde Park had fired the gun."

According to Butler, the news article stimulated his memory as to an incident that had occurred in the fall of 1986. Butler stated that at that time he had been at a liquor store in Hyde Park to buy liquor when he heard a voice from a parked car say "Hi, Jackie. How ya doing?" Butler saw the man known to him as "Louis" in the backseat of the car with a gun in his hand. Butler testified that Marotta then stated that he was "on the run [because] he just shot some kid."

Based on the news article, Butler called his former girl friend, Quish, and learned that "Louis's" last name was Marotta. He then went to the police and picked out Marotta's picture from a photographic display. Finally, Butler indicated in his direct examination that he had not initially believed Marotta's statement because he thought Marotta was just attempting to act "[m]acho." ·

As might be expected, the prosecutor's cross-examination of Butler was vigorous. The defendant now claims that four aspects of that cross-examination were improper and that the judge should not have instructed the jury during Butler's testimony on the subject of witness credibility.

(a) As has been indicated, Butler testified on direct examination that a news article about the trial in the January 14, 1988, edition of the Boston Herald revived his memory with respect to Marotta's alleged statement against penal interest. On cross-examination, Butler admitted that he had told the police that there were certain news stories in the media that he had followed and that the victim's murder was one such story. Butler also reiterated that he did not connect Marotta's name to the incident until he read the Boston Herald article of January 14, 1988. Butler admitted, however, that he was a "regular reader" of that newspaper.

Based on this background, the prosecutor confronted Butler with a news article in the Boston Herald of Friday, January 30, 1987, which contained virtually the same information as the article printed about one year later. Butler was asked to read the article to himself. Objection was made at sidebar to any use of the article on the ground that proper foundation required preliminary acknowledgement by Butler that he had read the 1987 article prior to trial. The judge permitted the examination to continue in view of the "prominen[ce]" of the article and Butler's testimony that "he [had] followed this case in the newspaper," but she instructed the prosecutor to "lay more of a foundation." The prosecutor continued his cross-examination, pointing out that the article before Butler identified Louis Marotta and the defense claim that Marotta, not the defendant, had been the shooter. Further objections as to foundation were made and overruled. Butler, however, indicated in response to a question by the prosecutor about his failure to come forward sooner with his information about Marotta: "No. I didn't read that [the January 30, 1987] article. Reading the newspaper is not a religion. I just pick it up and follow Larry Bird's career." Shortly after this answer, the prosecutor suspended inquiry on the 1987 article.

The defendant argues that cross-examination of Butler about the 1987 news article should not have been permitted without a statement by Butler that he had read the article. In the defendant's view, the questioning that occurred was unfair and prejudicial. We do not agree.

The prosecutor was obviously entitled to suggest that Butler's direct testimony was recently contrived and that Butler, in fact, had known of the information about Marotta much earlier. See *Commonwealth* v. *Nickerson*, 386 Mass. 54, 57-58 (1982); *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 295-296 (1981). The inquiry about the 1987 article was set against a background of admissions by Butler that he was a regular reader of the Boston Herald and that he had followed news of this particular case in the media. The judge appears to have allowed the questioning about the article de bene, in the expectation that the prosecutor would eventually establish that it would have been natural for Butler to have come forward earlier with his exculpatory information. That expectation was never fulfilled, but Butler did eventually state that he had not read the 1987 article which introduced no new information into the case. Examination on the article stopped with Butler's denial of knowledge about its contents. There was no motion to strike any part of the cross-examination.

The jury could not have been left with any misimpression. They had before them (i) Butler's testimony that the 1988 article had awakened him to the possible significance of Marotta's alleged remarks; (ii) the existence of a 1987 article in the same newspaper containing information about Marotta similar to the 1988 article; (iii) Butler's statement that he was following news of the case and was a regular reader of the newspaper that had published both articles; (iv) Butler's categorical denial; and (v) his explanation that regular reading of the Herald was not a religion and would have been confined to following the careers of certain sports figures. The issue raised by the attempted impeachment — whether it might be possible for even a faithful follower of the story to have missed one article about it in a newspaper

he professed to read — was, we think, something for the jury to consider in weighing the evidence and the over-all credibility of the witnesses. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 745 (1990). This is not a situation in which a prosecutor, without any testimonial foundation, interjected prejudicial material into the trial. Contrast *Commonwealth* v. *Olszewski*, 401 Mass. 749, 759 (1988). We perceive nothing in this claim which might require a new trial.

(b) The defendant also claims that the judge should not have permitted cross-examination of Butler on three other points: physical violence toward Quish, a hypothetical situation, and a "tab" that Butler maintained at a local tavern.

On the first point, Butler testified, as has been indicated, that he met Marotta in 1981 or 1982 through a former girl friend, Mary Quish. He stated that he saw Marotta "occasionally" and that Marotta had visited at Butler's apartment on Harvard Street in Hyde Park, which Quish shared with Butler. According to Butler, Quish had once asked Marotta to install a new lock on the door of the apartment, although the apartment was not Quish's and Butler had not asked Marotta to install the lock. Although Butler denied any physical violence toward Quish, Quish testified that Butler had tried to choke her on the day before she had the lock changed.

The defendant argues that the judge should have sustained his objections to any examination of Butler and Quish about physical violence. The aim of the examination, of course, was to suggest that Butler harbored a bias toward Marotta, and thus was inclined to finger him, because Marotta had become involved with Quish.

The judge had some discretion on the issue. But it is not necessary to decide whether she exceeded that discretion in permitting the examination because the judge decided later that the entire colloquy should be struck from the record. The judge twice instructed the jury in express terms, once before closing argument and once after, to disregard the testimony of Butler and Quish as to any physical violence between them in assessing Butler's credibility. "[W]e shall not

assume that jurors will slight strong and precise instructions of the trial judge to disregard the matters which have been withdrawn from their consideration." *Commonwealth* v. *Gordon*, 356 Mass. 598, 604 (1970). We are satisfied that the judge's strong, precise, and repeated instruction eliminated any problem.

On the second point, the defendant claims that the judge abused her discretion in permitting cross-examination of Butler regarding a hypothetical situation. Butler had testified that he did not immediately report Marotta's statement to the police because he did not think that Marotta was serious. The prosecutor then asked Butler whether he would have reported Marotta's statement if he had thought Marotta was serious. The defendant objected. The defendant contends that "[t]he state of the evidence being that Butler did not believe it when he heard it, the question was entirely hypothetical."

"Parties to litigation are entitled as a matter of right to the reasonable cross-examination of witnesses against them for the purpose of attempting to impeach or discredit their testimony." *Commonwealth* v. *Underwood*, 358 Mass. 506, 513 (1970). "[T]he scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge, not subject to revision unless prejudice is shown to a party by reason of too narrow restriction or too great breadth of inquiry." *Id.*, quoting *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952); *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 593 (1956).

Butler had claimed that his reason for remaining silent was that he did not believe Marotta. The judge properly exercised her discretion in permitting the prosecutor to impeach the witness's account by asking whether Butler would have come forward if he *did* believe Marotta. The prosecutor at sidebar expressly justified his question as bearing on Butler's statement and his state of mind inquiry as part of a broader inquiry tending to suggest recent contrivance. The

exchange was brief and a minor point in a much larger cross-examination. It did not constitute error.

On the third point, the defendant claims that the judge abused her discretion in permitting cross-examination of Butler on a tavern "tab." Butler had testified that he first reported Marotta's statement to the police after he had had "a few" drinks at a tavern where he was a "regular customer." The prosecutor then asked Butler whether he ran a "tab" at the tavern. The defendant objected and argues on appeal that the question was collateral.

It could be argued that the question was properly allowed by the judge, in an exercise of discretion, to show that Butler, as a drinker, might have lacked ability to remember correctly a statement made by Marotta outside a liquor store and first reported to the Boston police one and one-half years later after Butler had had "a few" drinks at a bar where he was a "regular customer." On balance, however, we think it was error to allow the questioning, but conclude that there was nothing in it that prejudiced the defendant.

(c) Finally, the defendant maintains that the judge should not have instructed the jury during Butler's testimony on their function as to determining the credibility of the evidence. During redirect examination, Butler stated that he had come forward because he was concerned that "the wrong person" had been charged. Immediately following this testimony, the judge instructed the jury sua sponte as follows: "Mr. Foreman and ladies and gentlemen, as you know, the credibility and believability of all evidence is for your consideration and that is going to be what you are going to decide." The defendant did not object, but now argues that the unrequested instruction may have improperly told the jury to be more concerned with Butler's credibility than that of other witnesses.

An out-of-court statement made by a person that he, and not the defendant on trial, committed the crime is admissible where: (1) the declarant's testimony is unavailable; (2) the statement tends so far to subject the declarant to criminal liability that a reasonable man would not have made the

statement unless he believed it were true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its truthfulness. See *Commonwealth* v. *Galloway*, 404 Mass. 204, 207-208 (1989); *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986). The judge decides whether these conditions are met and, particularly in reference to the third factor, "judges are obliged to exercise a discriminating judgment." *Commonwealth* v. *Drew, supra* at 75, quoting *Commonwealth* v. *Doherty*, 394 Mass. 341, 347 (1985). If the issue is close, the judge should favor admitting the statement. "In most such instances, the good sense of the jury will correct any prejudicial impact." *Commonwealth* v. *Galloway, supra* at 209.

Here, after admitting Marotta's statement, the judge decided to remind the jury that they are the finders of fact and of credibility. Although the witness had testified on the basis of the statement that the defendant was possibly the wrong man, the judge reminded the jury that the weight accorded all evidence and, in particular, evidence on the decisive issue at trial, was for their determination alone.

Moreover, the judge was expressly directed by law to evaluate the reliability of the proffered statement. If the issue appeared close, she was to favor admission, relying on "the good sense of the jury to correct any prejudicial impact." The instruction could have been given at a later time. The absence of any objection to the instruction by the defendant's experienced trial counsel indicates that it was not perceived by him as offensive. We see no error.

2. *The jury's knowledge of Marotta's claim of privilege.* During the presentation of his case, the defendant sought to call Louis Marotta to the stand. The judge conducted a voir dire, during which she determined that Marotta intended to invoke his Fifth Amendment privilege against self-incrimination, and that he had valid grounds for doing so. The judge thus ruled that Marotta could not be called to the stand to be forced to invoke his privilege before the jury. Defense counsel then moved for permission to comment in his closing on Marotta's absence, by asking the jury to "consider why

[Marotta] was not presented as a witness." The judge denied this motion, ruling that the parties could "argue anything that's in the evidence about Marotta . . . [but that] there is to be no comment by either party on the fact that [Marotta] was not called as a witness before the jury." The judge also denied the defendant's motion to have his subpoena of Marotta admitted in evidence. The defendant now contends that these rulings violated his State constitutional right "to produce all proofs, that may be favorable to him." Art. 12 of the Declaration of Rights of the Massachusetts Constitution.[4]

The defendant recognizes that the argument he makes under the Sixth Amendment to the United States Constitution runs counter to the holding in *Commonwealth* v. *Hesketh*, 386 Mass. 153 (1982). The factual background of *Hesketh* is virtually identical to that of the instant case. The main issue at that trial was whether the defendant or one Roberts had committed the alleged crimes. Prior to trial, the defendant informed the court that he intended to call Roberts as a witness, and that he (the defendant) understood that Roberts would invoke his privilege against self-incrimination. After conducting a voir dire, the judge concluded that, if called to the stand, Roberts would properly invoke the privilege. Accordingly, the judge ruled that Roberts could not be called as a witness, and the defendant claimed constitutional error.

In affirming that defendant's conviction, we reasoned that the "right to confront and to cross-examine [witnesses] is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The Fifth Amendment privilege against self-incrimination, when properly invoked, is clearly one of those interests" (citations omitted). *Commonwealth* v. *Hesketh, supra* at 156, quoting *Commonwealth* v. *Francis*, 375 Mass. 211, 214, cert. denied, 439 U.S. 872 (1978). See *Chambers* v. *Mississippi*,

---

[4]While his claim relies primarily on art. 12, the defendant also alleges violation of his Sixth Amendment right under the United States Constitution "to have compulsory process for obtaining witnesses in his favor."

410 U.S. 284, 295 (1973). Consequently, we held that "the Sixth Amendment does not give the defendant the right to have a witness invoke the privilege against self-incrimination in front of the jury."[5] *Id.*

Because we have previously decided, and repeat today, that the Federal Constitution does not grant the right claimed here,[6] we construe the defendant's argument as a request that we interpret art. 12 of our State Constitution more broadly. In particular, we must determine whether, in order to vindicate a criminal defendant's rights pursuant to art. 12, a judge has discretion to permit a witness to be called to the stand for the sole purpose of invoking his or her privilege against self-incrimination before the jury. For the reasons which follow, we must answer this question in the negative.

The express purpose of art. 12, as is true of the Sixth Amendment's compulsory process clause, see *United States v. Roberts*, 503 F.2d 598, 600 (9th Cir. 1974), cert. denied, 419 U.S. 1113 (1975), is to grant criminal defendants the right to produce evidence which might tend to exculpate them. This objective is not implicated when the testimony or material sought to be produced lacks any probative value as to the defendant's guilt or innocence of the particular crime charged. Such is the case here, where the defendant claims a constitutional right to call Marotta to the stand, fully cognizant of the fact that Marotta, if called, would invoke his privilege and refuse to answer any questions. Marotta's invocation of the privilege could be based on factors wholly unrelated to the crimes with which the defendant is charged, see *People v. Thomas*, 51 N.Y.2d 466, 472 (1980), or, for that matter, unrelated to any criminal conduct whatsoever. See

---

[5]This holding is consistent with those reached by a number of Federal and State courts which have considered the issue. See, e.g., *United States v. Espinoza*, 578 F.2d 224, 228 (9th Cir.), cert. denied sub nom. *Oropeza-Briones v. United States*, 439 U.S. 849 (1978); *United States v. Reese*, 561 F.2d 894, 899 (D.C. Cir. 1977); *United States v. Roberts*, 503 F.2d 598, 600 (9th Cir. 1974); *Williams v. State*, 600 P.2d 1092, 1093 (Alaska 1979); *People v. Dyer*, 425 Mich. 572, 576 (1986).

[6]Our holding in *Hesketh* was based solely on Federal constitutional law. See 386 Mass. at 156 n.3.

*Slochower* v. *Board of Higher Educ.*, 350 U.S. 551, 557 (1956) ("[A] witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing"). Calling Marotta to the stand would not produce any relevant evidence, see *People* v. *Dyer*, 425 Mich. 572, 579 (1986), and thus does not implicate the principles underlying art. 12.

While Marotta's invocation of the privilege against self-incrimination would not furnish the jury with any probative evidence of the defendant's guilt or innocence, that act nonetheless would be highly likely to have a strong and illegitimate impact on the jury's deliberations. See *Bowles* v. *United States*, 439 F.2d 536, 541 (D.C. Cir. 1970) (en banc), cert. denied, 401 U.S. 995 (1971); *People* v. *Thomas*, *supra* at 472. "It has long been recognized that jurors tend to view a witness' invocation of the privilege as a 'clear confession of crime.'" *State* v. *Corrales*, 138 Ariz. 583, 590 (1983), quoting 8 J. Wigmore, Evidence § 2272, at 426 (McNaughton rev. ed. 1961). On these particular facts, "[h]ad [Marotta] testified that he would not answer questions regarding the transaction at issue in this case on grounds that those answers might tend to incriminate him, the jury might have inferred that [Marotta] was covering up because he, not the defendant, was the wrongdoer." *People* v. *Dyer*, *supra* at 575. Were Marotta permitted to invoke the privilege before the jury, the pronounced effect would be to invite the jurors to speculate (1) that Marotta was guilty of some crime; (2) that he was guilty of the particular crime with which the defendant is charged; and (3) that, therefore, the defendant must be innocent of that crime.

Allowing the jury to draw such inferences from a witness's decision to invoke his constitutional rights is improper. The United States Supreme Court has observed that "[t]he privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury." *Slochower* v. *Board of Higher Educ.*, *supra* at 557. Because a witness who exercises his Fifth Amendment right is not admitting guilt, no inferences, either in favor of the prosecutor

or of the defendant, may be drawn from that refusal to testify. See *Commonwealth* v. *Ries*, 337 Mass. 565, 586 (1958); *Bowles* v. *United States, supra* at 541; *Billeci* v. *United States*, 184 F.2d 394, 398 (D.C. Cir. 1950). In summary, then, calling Marotta to the stand in the face of his expressed intention to invoke his privilege against self-incrimination would have produced no relevant evidence, while inviting the jury to engage in unwarranted and impermissible speculation.

We therefore conclude that a trial judge has no discretion to permit a witness to appear before a jury for the sole purpose of properly[7] invoking his or her privilege against self-incrimination. Article 12 requires nothing to the contrary. We further conclude that the defendant was not entitled to enter in evidence his subpoena of Marotta, or to ask the jury to consider why Marotta did not testify.[8] Each of these alternatives is merely an indirect attempt to put before the jury information — namely, the fact that Marotta had invoked his Fifth Amendment privilege not to testify — that we have determined may not be put before them directly. See *Commonwealth* v. *Ries, supra* at 585; *Bowles* v. *United States, supra* at 542; *People* v. *Thomas, supra* at 473. The judge committed no error when she ruled against the defendant on each of these three requests.[9]

---

[7]There is no dispute here that Marotta had proper grounds for invoking his privilege not to testify.

[8]This conclusion rests on the fact that the missing witness had successfully invoked a testimonial privilege, and thus was unavailable to be called as a witness by either party. See *Commonwealth* v. *DiPietro*, 373 Mass. 369, 382 (1977). By contrast, when a witness is not called despite being available, we have permitted, on a case-by-case basis, statements in closing argument requesting the jury to consider why the witness was not called to testify. See, e.g., *Commonwealth* v. *Niziolek*, 380 Mass. 513, 518 (1980); *Commonwealth* v. *Franklin*, 366 Mass. 284, 292-293 (1974).

[9]In appropriate circumstances, a defendant can seek to ameliorate any potential harm to his case by requesting a neutralizing instruction such as the following: "There has been testimony in this case about [a witness] named [John Doe]. As a result of a hearing held outside the presence of the jury, the Court has determined the [Mr. Doe] is not available to be called as a witness by either side in this case. The jury may not draw any

3. *Admission of the spent cartridge.* The defendant objects
to the admission in evidence of a .38 caliber cartridge case
which was found on a shelf in his bedroom on October 1,
1986 — four days after the shooting.[10] This evidence was
presented in conjunction with the testimony of the Common-
wealth's ballistics expert, who stated that the projectile re-
covered from the victim's body was a .38 caliber projectile,
and had been fired from either a .38 caliber or a .357 caliber
revolver. The expert also testified that this projectile was
"consistent with the type of projectile that could be or was
loaded into the discharged cartridge case." An instrument in
the possession of a defendant at or about the time of the
crime that could have been used in committing the crime is
admissible in the judge's discretion. *Commonwealth* v. *Toro*,
395 Mass. 354, 356 (1985).

However, the defendant contends that the judge abused
her discretion in admitting the cartridge case because, in
these circumstances, its potential for prejudice exceeded its
probative value. In particular, the defendant claims he could
not possibly have returned to his apartment to deposit the
cartridge between the time of the shooting and his arrest the
following day, September 29, 1986, at approximately 5 P.M.
Furthermore, the defendant argues that, if he had been car-
rying the spent cartridge on the day of the shooting, it would
have been discovered when his person was searched that day
by the Brookline police pursuant to his arrest on an unrelated
traffic offense warrant. No cartridge was found in that
search.

The Commonwealth points out, however, that (1) the de-
fendant could have placed the cartridge in his apartment be-
tween the time of his release from the Brookline police sta-

---

inference from the fact that [Mr. Doe] did not appear as a witness."
*United States* v. *Martin*, 526 F.2d 485, 486-487 (10th Cir. 1975).

[10]The .38 caliber cartridge case was admitted as part of an exhibit
which also included a .357 caliber cartridge case, a 9 millimeter cartridge
case, a live .22 caliber round, and a live .357 caliber round. However, the
defendant's appeal challenges only the admission of the .38 caliber car-
tridge case. We thus consider only that one item.

tion during the afternoon of September 29, and his arrest at 5 P.M. that day, and (2) there is no evidence that the Brookline police searched the defendant's car, where the cartridge might have been hidden.

We agree with the Commonwealth that the evidence permits an inference that the defendant could have removed the cartridge from which the fatal shot was fired, hidden it in his car, and later placed it on the shelf in his bedroom prior to his arrest at 5 P.M. on September 29. For this reason, the cartridge had probative value in so far as it tended to prove that the defendant had possession of the murder weapon, or perhaps even the precise cartridge from which the fatal bullet was fired. "[I]t is commonly competent to show the possession by a defendant of an instrument capable of being used in the commission of the crime, without direct proof that that particular instrument was in fact the one used." *Commonwealth* v. *Toro, supra* at 356, quoting *Commonwealth* v. *O'Toole,* 326 Mass. 35, 39 (1950). We conclude that the judge did not abuse her discretion by admitting the cartridge in evidence.

4: *The denial of a required finding on the conspiracy charge.* The defendant argues that the judge should have allowed his motion for a required finding on the indictment which charged him with conspiracy to burn a motor vehicle. That conspiracy involved the defendant and Marotta and concerned a blue Cadillac automobile in the possession of one Joseph Guarrado.

The question in deciding a motion for a required finding of not guilty is whether on the evidence viewed in the light most favorable to the Commonwealth, the jury "might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt." *Commonwealth* v. *Clary,* 388 Mass. 583, 588 (1983), quoting *Commonwealth* v. *Vellucci,* 284 Mass. 443, 445 (1933). A jury may find a crime proved beyond a reasonable doubt even though the inference of guilt from the

facts established is not inescapable or necessary. *Common-wealth* v. *Nelson*, 370 Mass. 192, 201 (1976).

Further, the crime of conspiracy need not be proved by direct evidence of participation or by an admission of participation. *Commonwealth* v. *Nelson*, *supra* at 200. "A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object . . . may be satisfactory proof of a conspiracy." *Id.* at 200-201, quoting *Commonwealth* v. *Smith*, 163 Mass. 411, 417-418 (1895). "Circumstances must be shown from which a reasonable inference can be drawn that the defendant participated in the particular conspiracy charged." *Id.* at 201, quoting *Commonwealth* v. *Schnackenberg*, 356 Mass. 65, 74 (1969).

The evidence in this case, viewed in the light most favorable to the Commonwealth, was sufficient to permit a finding of conspiracy between the defendant and Marotta to commit arson. There was evidence presented that Joseph Guarrado, a friend of the defendant, had been trying for months to sell his blue Cadillac automobile, that he asked the defendant for help in getting rid of the automobile and that the defendant said he knew of someone who might be able to help. It was shown that the defendant then called Marotta and arranged for Marotta to drive up to New Hampshire, where the car was located, to pick it up, that the defendant removed the stereo system, hub caps, and other valuable parts from the car, and that the defendant "popped" the car's ignition. There was further evidence that Marianne Karon (Guarrado's girl friend) told a neighbor on the day of the incident that she was sad because her car would be stolen that evening, that the defendant and Marotta drove to New Hampshire together on the day of the incident, and that the defendant and Marotta drove back from New Hampshire separately (Marotta in the Cadillac; the defendant in his own car) to the defendant's home in Revere.

The prosecutor also presented evidence that the defendant and Marotta conferred at that time before leaving in separate cars for the home of Marotta's friend in Roslindale, that on their way to Roslindale, stones were allegedly thrown at one of the cars, that both men parked their automobiles and together proceeded to the scene of the victim's shooting, that after the shooting both men were seen running together from the scene no more than two feet apart. Finally, the prosecutor presented testimony that the blue Cadillac was found burned in South Boston approximately thirty minutes after the shooting, that the fire had been deliberately set, that Karon later that night reported the blue Cadillac stolen, and that the whereabouts of the defendant were unknown from the time of the shooting until early the following morning.

On the basis of this evidence, the jury could properly have concluded that the defendant, Marotta, Guarrado, and Karon agreed to stage a car theft, that, in the course of staging that theft the car was brought to the attention of eyewitnesses to the victim's death, and that the defendant and Marotta, at least, at some point subsequent to the initial agreement agreed to burn the car. That the defendant and Marotta had been involved in a murder approximately thirty minutes before the arson, that they had discussed the car with eyewitnesses to the murder, and that they were seen together with the car driving away from the location of the murder provided a basis for a reasonable inference that the defendant knew of, and agreed to, the arson in an attempt to conceal his involvement in the murder and to inhibit investigation and discovery. "The fact that the evidence did not require the jury to draw [this] inference . . . does not preclude the conclusion we have reached. It is sufficient that the evidence permitted the inference which the jury obviously drew against [the defendant]." *Commonwealth* v. *Nelson, supra* at 203.

5. *Review under G. L. c. 278, § 33E.* We have examined the record to ascertain whether there might be a basis for relief pursuant to the power conferred on this court by G. L. c. 278, § 33E. The murder was a premeditated, senseless kill-

ing of a thirteen year old boy. There is nothing in the record which provides any basis for reduction of the degree of murder or any reason for a new trial.

*Judgments affirmed.*

ALICE BOWEN *vs*. ELI LILLY & CO., INC.

Worcester. April 2, 1990. - August 6, 1990.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Limitations, Statute of. Negligence*, Pharmaceutical manufacturer.

Discussion of the "discovery rule" for determining when a cause of action accrues, as applicable to the question whether the notice a plaintiff had of the cause of her physical harm was sufficient to commence the running of the statute of limitations on her claim against a pharmaceutical manufacturer. [205-208]

In a tort action against a pharmaceutical manufacturer, the record in summary judgment proceedings established that a reasonable person in the plaintiff's position would have been on notice, more than three years before commencing her action, that her mother's ingestion during pregnancy of a certain prescription drug, manufactured by the defendant, may have caused the plaintiff's cancer; consequently, the claim was barred by the statute of limitations. [208-211]

CIVIL ACTION commenced in the Superior Court Department on March 23, 1983.

The case was heard by *William C. O'Neil, Jr.*, J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John F. Keenan*, for the plaintiff.

*Loretta M. Smith* (*Marshall Simonds* with her) for the defendant.

WILKINS, J. The defendant argues that the plaintiff's negligence claim is barred because she commenced this action more than three years after her cause of action accrued. G. L. c. 260, § 2A (1988 ed.). A judge in the Superior Court agreed and allowed the defendant's motion for summary

judgment. We transferred the plaintiff's appeal here on our own motion and now affirm the judgment.[1]

We summarize the undisputed record facts. During her pregnancy with the plaintiff, the plaintiff's mother took the prescription drug diethylstilbestrol (DES) to prevent a threatened miscarriage. The plaintiff was born on April 14, 1948. In 1969 the plaintiff underwent an operation for a malignant vaginal tumor, during which a colostomy was performed as well as a radical hysterectomy. The complaint in this action was filed approximately fourteen years later on March 23, 1983. The question is whether, on the summary judgment record, there is a dispute of material fact as to whether the three-year statute of limitations had run before this action was commenced.[2]

This court has recognized the unfairness of a rule that holds that the statute of limitations has run even before a plaintiff knew or reasonably should have known that she may have been harmed by the conduct of another. We, therefore, have developed (in the absence of a governing statute) a discovery rule for the purpose of determining when a cause of action accrues, and thus when the statute of limitations starts to run. This rule prescribes as crucial the date when a plaintiff discovers, or any earlier date when she should reasonably

---

[1]A separate claim based on breach of warranty was also decided against the plaintiff in part because there was no privity of contract between the plaintiff and the defendant. At the time of the plaintiff's injuries, lack of privity was a defense to a breach of warranty claim. See *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 34-36 (1977). The plaintiff has not appealed from that ruling.

[2]We treat as properly part of the summary judgment record documents that the plaintiff produced in response to a court order erroneously entered and later revoked. The judge who decided the summary judgment question was asked to reconsider the question and implicitly ruled that the documents were a proper subject of a motion to produce. He was correct.

The claim, raised for the first time on appeal, that an affidavit referring to attached documents, signed by an attorney for the defendant, failed to comply with Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974), lacks merit. The attached documents were portions of deposition transcripts and documents produced by the plaintiff.

have discovered, that she has been harmed or may have been harmed by the defendant's conduct.

We first adopted the discovery rule in *Hendrickson v. Sears*, 365 Mass. 83, 83-84 (1974). There we held that, if an attorney's negligent title search overlooked an easement of record and the title defect was, in the circumstances, inherently unknowable by his clients, their cause of action against him did not accrue until they discovered or should reasonably have discovered the attorney's misrepresentation concerning the record title. *Id.* at 90-91. We declined to apply the rule, then applicable to medical malpractice claims, that the statutory period began to run when the negligent act occurred, even if the plaintiff could not reasonably ascertain the harm until later. *Id.* at 86, citing *Capucci v. Barone*, 266 Mass. 578, 581 (1929). Two years after the *Hendrickson* case, we applied the discovery rule to claims of fraudulent misrepresentations in the sale of real estate. *Friedman v. Jablonski*, 371 Mass. 482, 485 (1976). We recognized that, when the plaintiffs claimed a misrepresentation concerning the existence of a right of way over other property, the plaintiffs had certain obligations of reasonable inquiry and that the decision whether any misrepresentation should reasonably have been uncovered had to be made in light of what reasonable inquiry would have disclosed. *Id.* at 485-486. We concluded that by the time the plaintiffs took title to the property, reasonable inquiry would have shown that there was no right of way, and thus the statute of limitations began to run at that time. *Id.*

We extended the discovery rule to medical malpractice actions, thus overruling *Capucci v. Barone, supra*, in *Franklin v. Albert*, 381 Mass. 611, 618-619 (1980). We said that medical malpractice "causes of action accrue when the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant's conduct." *Id.* at 619. The principle thus stated does not require that the plaintiff know or have reason to know that the defendant violated a legal duty to the plaintiff, but only that she knew or had reason to know that she had been harmed by the defendant's conduct.

See *White* v. *Peabody Constr. Co.*, 386 Mass. 121, 130 (1982) ("The 'notice' required is not notice of every fact which must eventually be proved in support of the claim"); *Fidler* v. *Eastman Kodak Co.*, 714 F.2d 192, 198-199 (1st Cir. 1983) (Massachusetts law). The plaintiff need not know the full extent of the injury before the statute starts to run. *Olsen* v. *Bell Tel. Laboratories, Inc.*, 388 Mass. 171, 175 (1983). The important point is that the statute of limitations starts to run when an event or events have occurred that were reasonably likely to put the plaintiff on notice that someone may have caused her injury. See *Franklin* v. *Albert*, *supra* at 618.

This case presents an aspect of the discovery rule with which this court has not previously been confronted. Our prior cases have focused on the question whether, in given circumstances, the plaintiffs should reasonably have discovered that they had been harmed. In each of these cases, there was no significant doubt concerning the cause of the harm once the plaintiffs discovered it. In this case, on the other hand, the plaintiff was always well aware that she had sustained substantial physical harm. The question is whether she was sufficiently on notice as to the cause of her physical harm.

Construing Massachusetts law, the Court of Appeals for the First Circuit in 1983 faced the question of the level of notice of causation a plaintiff must have to trigger the running of the statute of limitations. *Fidler* v. *Eastman Kodak Co.*, 714 F.2d 192, 199 (1st Cir. 1983). The Court of Appeals said: "Defining how much notice of cause is enough notice is inherently problematic where, as here, establishment of actual causation is itself an issue to be resolved at trial on the merits. If cause were defined in its strictest sense, a cause of action would never accrue for purposes of the statute until cause, when at issue, had been resolved at trial. See *Dawson* v. *Eli Lilly Co.*, 543 F. Supp. 1330, 1334 (D.D.C. 1982). Such a definition would entirely defeat the purposes of a statute of limitations in this class of cases, and we know of no court which has gone so far." *Id.* at 198. The court con-

cluded "that under Massachusetts law notice of likely cause is ordinarily enough to start the statute running. Thus on notice, the potential litigant has the duty to discover from the legal, scientific, and medical communities whether the theory of causation is supportable and whether it supports a legal claim." *Id.* at 199.

The plaintiff argues that the reference to "notice of likely cause" in the quoted language means that a plaintiff must have probable cause to believe that the defendant's acts were the cause of her physical injuries before the statute begins to run. There is no Massachusetts case law in support of this view. The Court of Appeals opinion does not adopt that position. Our Appeals Court did not read the Court of Appeals opinion as the plaintiff claims when it said: "Massachusetts does not require discovery of each of the elements of the cause of action — duty, breach, causation, and damages before the limitation clock in G. L. c. 260, § 4 starts ticking. . . . Rather, the three-year limitations period commences to run when a reasonably prudent person (in the tort claimant's position), reacting to any suspicious circumstances of which he might have been aware (what the Court of Appeals in *Fidler* called 'likely cause'), should have discovered that he had been harmed by his physician's treatment." (Citations and footnote omitted.) *Malapanis* v. *Shirazi*, 21 Mass. App. Ct. 378, 382-383 (1986). We do not require that a plaintiff have notice of a breach of a duty before a cause of action may accrue, but we do require that a plaintiff have (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was.

We shall now turn to the summary judgment record to see whether a reasonable person in the position of the plaintiff would have been on notice that her mother's ingestion of DES may have caused the plaintiff's cancer. Whether in a given case there was significant notice of causation depends on the facts. We conclude that the plaintiff had such direct information bearing on the cause of her cancer that the statute of limitations ran before this action was commenced.

After the 1969 operation on the plaintiff, at the request of the operating surgeon, the plaintiff and her mother met with Dr. Arthur L. Herbst, a medical researcher. Dr. Herbst asked them many questions, including questions about what medication the plaintiff's mother may have taken during pregnancy. Her mother told Dr. Herbst in the plaintiff's presence that she had taken DES. On April 15, 1971, Dr. Herbst wrote a letter to the plaintiff's mother, which the plaintiff, then twenty-three years old, read. In that letter, Dr. Herbst stated that as a result of the study of women with vaginal tumors "we have found an important association" between the ingestion of DES by pregnant women and vaginal tumors in their daughters but it was "certainly not the sole cause" of the kind of cancer the plaintiff had had.[3]

In 1971, an article by Dr. Herbst and two other physicians was published stating that there was a statistically significant association between the ingestion of DES by pregnant women and the appearance of clear cell adenocarcinoma of the vagina in a small number of their daughters.[4] The article

---

[3]The substance of the letter states: "As I recently told you over the telephone, our study of girls with vaginal tumors has been completed. The results show that among the eight mothers of girls who developed this tumor, seven took the hormone, stilbestrol, starting early in pregnancy. It is important to realize that one mother took no hormones during pregnancy, and her daughter still developed a tumor. In summary, we have found an important association, but this is certainly not the sole cause of these tumors."

[4]The article, published in the New England Journal of Medicine, was entitled "ADENOCARCINOMA OF THE VAGINA" and subtitled "Association of Maternal Stilbestrol Therapy with Tumor Appearance in Young Women." An abstract of the article, appearing in bold print below its heading, reads as follows: "Adenocarcinoma of the vagina in young women had been recorded rarely before the report of several cases treated at the Vincent Memorial Hospital between 1966 and 1969. The unusual occurrence of this tumor in eight patients born in New England hospitals between 1946 and 1951 led us to conduct a retrospective investigation in search of factors that might be associated with tumor appearance. Four matched controls were established for each patient: data were obtained by personal interview. Results show maternal bleeding during the current pregnancy and previous pregnancy loss were more common in the study group. Most significantly, seven of the eight mothers of patients with carcinoma had been treated with diethylstilbestrol started during the first tri-

states that maternal ingestion of DES during early pregnancy "appears to have enhanced the risk of vaginal adenocarcinoma developing years later in the offspring exposed." Dr. Herbst sent a copy of the article to the plaintiff's mother in 1971, and the plaintiff read it. She knew the article was "about me."

In 1972 the plaintiff began to keep a file of magazine articles that discussed the DES controversy. Among those articles was one dated February, 1976, written by a physician and read at the time by the plaintiff, which stated that "[a]s dozens of similar cases were reported, it became clear that the culprit [i.e., the cause of the exceedingly rare vaginal cancer] was [DES]."

We conclude that, on the summary judgment record, the prospect of a significant causal connection between DES and the plaintiff's cancer was brought to the plaintiff's attention more than three years before this action was commenced. The fact it was not until June, 1982, that the plaintiff believed that DES caused her cancer does not aid her because we test the accrual of her cause of action by what a reasonable person in her position would have known or on inquiry would have discovered at the various relevant times. In this case, the plaintiff was aware not only of numerous articles published in the popular media but also she knew of scientific opinion, based in part on the plaintiff's own circumstances, stating that there was the prospect of a causal link between DES and the rare vaginal cancer from which she suffered.

Reasonable notice that a particular product or a particular act of another person may have been a cause of harm to a plaintiff creates a duty of inquiry and starts the running of the statute of limitations. On the undisputed facts, the plaintiff was on notice more than three years before this action was begun in 1983 that DES consumed by her mother may

---

mester. None of the control group were so treated (p less than 0.00001). Maternal ingestion of stilbestrol during early pregnancy appears to have enhanced the risk of vaginal adenocarcinoma developing years later in the offspring exposed." Herbst, A.L., & others, ADENOCARCINOMA OF THE VAGINA, 284 New Eng. J. Medicine 878 (April 22, 1971).

have caused her cancer. The evidence shows the plaintiff's firsthand knowledge of significant information from knowledgeable sources bearing on causation.

It is true that the record does not show uncontrovertibly that the plaintiff learned more than three years before this action was commenced that the defendant was the manufacturer of the DES that her mother ingested. Evidence of the manufacturer's identity, however, had been readily available at all times through the pharmacist who sold the DES to the plaintiff's mother. It is a fact as to which the plaintiff had a duty of inquiry based on the information concerning causation that she had.

*Judgment affirmed.*