Botsford, J.
The plaintiff RohmTech, Inc. (RohmTech) purchased the Derby Company (Derby) in July 1988 from the defendant Lois Ann Taylor and the estate of Roland Derby, Jr.[3] In January 1991, RohmTech received a notice of potential responsibility from the United States Environmental Protection Agency in relation to a chemically contaminated site in Ashland, Massachusetts where Derby had formerly been located along with other companies. The cleanup costs associated with this site are estimated to be at least $12,000,000. RohmTech brings this action against the Taylors for misrepresentation and breach of contract in connection with its purchase of Derby; RohmTech’s claims concern the alleged failure of the Taylors to disclose at the time of sale the existence of potential or threatened environmental claims or liabilities on the part of Derby arising out of its connection to the contaminated site.
The Taylors have moved for summary judgment on the grounds that all of the claims asserted by RohmTech are barred the applicable statutes of limitations. RohmTech opposes the motion. For the reasons discussed below, the motion for summary judgment is allowed.
Background
The summary judgment record reveals the following facts, which are undisputed unless otherwise noted, and in any event are considered in a light most favorable to RohmTech as the nonmoving party. Roland Derby, Sr. (Roland Sr.) was a Massachusetts resident involved for many years in operating businesses which tested and manufactured textiles and textile dyes. In 1949, Roland Sr. caused a corporation to be established called The Derby Company (Old Derby), which operated as a laboratory testing facility for textile products. As of 1964, Roland Sr. was also president of Textile Analine and Chemical Company which acquired in or about that year a company named Nyanza, Inc. (Nyanza). After the acquisition, Textile Analine changed its name to Nyanza. Nyanza had offices in Lawrence, Massachusetts, and also owned and occupied a manufacturing site in Ashland, Massachusetts (the Nyanza site or the Ashland site). At some point between 1964 and 1973, Old Derby became a wholly owned subsidiary of Nyanza.
Roland Sr. died in December 1966. After his death, his son Roland Derby, Jr. (Roland Jr.) came to own 100 percent of the stock of Nyanza.
Nyanza’s primary business was the manufacture of textile products and dyestuffs in particular. The manufacturing process used by Nyanza into the 1970s *617 involved the use of mercury, which was left at the Nyanza site. Many other chemicals were used as well. Beginning in the 1970s, local and State authorities began to contact Nyanza concerning the presence of mercury and other environmental contamination issues. In addition, Nyanza’s business began to falter. By the mid-1970s, Nyanza was essentially insolvent.
Roland Jr. caused Derby to be established in 1974. Derby’s business was different from Nyanza’s, and also from Old Derby’s. Derby was engaged in the manufacture of water-based and acrylic polymers. It did not use any of the same chemicals that Nyanza used. Derby was located in two buildings on the Nyanza site in Ashland.
Roland Jr. was named as president of Derby when the corporation was established in 1974, and was also president of Nyanza. Roland Jr., initially owned all of the stock in Derby, but later he gave two of the ten shares to his sister, the defendant Lois Taylor. Roland Jr. died in December 1977. The eight shares of stock he had held in Derby were placed in a trust.
In January 1978, the defendant Scott Derby Taylor[4] became president of Nyanza as well as of Derby. Nyanza was then liquidated, and the Nyanza site was sold. Derby continued its polymer manufacturing operations on the Nyanza site as a tenant of the new owner. In 1983, Nyanza was dissolved pursuant to statute (G.L.c. 156B, §101) for failure to file annual reports or tax returns.
In 1984, Derby moved its operations from Ashland to a new site in Fitchburg, Massachusetts. Scott Derby Taylor remained its president and, it appears, chief executive officer.
In 1985, the Commonwealth communicated to Derby that it had made an initial determination to name Derby as a potentially responsible party (PRP) under G.L.c. 2 IE in relation to the substantial amount of hazardous materials found at the Nyanza site in Ashland;[5] it appears the Nyanza site had been previously designated as a Superfund site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. 9601 et seq. Conversations and negotiations ensued between an attorney at Goodwin, Procter & Hoar (GP&H), the law firm representing Derby, and an Assistant Attorney General. As reflected in the notes of the attorney, Bradford Gentry, the Commonwealth was suggesting three different theories of liability on the part of Derby; (1) Derby had used and disposed of toxic chemicals found on the Nyanza site during the course of its ten years of operations there; (2) Derby had been an owner/operator at the site; and (3) Derby had very close corporate connections with Nyanza or companies associated with Nyanza.
As a result of the negotiations between Derby’s counsel and the Commonwealth and the information supplied by Derby from August 1985 until approximately June 1986, the Commonwealth ultimately did not name Derby as a PRP. Derby did not obtain, however, a formal release from any claims, actual or potential. Rather, it appears that there was an informal understanding that Derby would not be added to the PRP list at that time.
Beginning in approximately April of 1988, RohmTech and Scott Taylor, still president of Derby, began to discuss the sale of Derby to RohmTech. At that time, RohmTech was a wholly owned subsidiary of Rohm GmbH, a Germany company. RohmTech had been a purchaser of acrylic emulsions from Derby, which it used as components of leather finish products it sold. Scott Taylor met with the president of RohmTech, Ekkehard G. Grampp, and RohmTech’s comptroller, Joachim (Jake) Langer. According to Grampp, Langer was assigned the responsibility to conduct an investigation of Derby’s financial statements and records, and in general to play a significant role in RohmTech’s due diligence investigation into Derby. (Grampp affidavit, ¶¶13-17, 26, 33-35.)
RohmTech was concerned about environmental liabilities in connection with its possible purchase of Derby, and Grampp specifically asked Scott Taylor whether Derby had any such liabilities. Taylor told the RohmTech representatives that Derby had no environmental liability, including in particular no liability related to the Nyanza site in Ashland. (See Grampp affidavit, ¶18; Deposition of Scott Taylor, pp. 215-216 [Appel affidavit, ex. B].) In addition, Taylor stated to John Hushon, an attorney with the firm of Arent Fox Kintner Plotkin & Kahn (Arent Fox) who was representing RohmTech in connection with the sale transaction, that when Derby moved from Ashland to its new site in Fitchburg in 1984, it had a “clean departure.” Taylor showed Hushon a letter from the Massachusetts Department of Environmental Quality Engineering (DEQE) which stated in substance “that Derby was — had left a clean site and was essentially free to go on and do its business somewhere else.” (Hushon deposition, p. 156 [Appel affidavit, ex. I].) Nevertheless, Taylor and John Ploubides, then the general manager of Derby, stated to Langer and others employed by RohmTech that Roland Jr. had at one time owned both Derby and Nyanza, and that both companies had been located on the Nyanza site. (Langer affidavit, ¶5.)[6] In addition, at least Langer among the RohmTech representatives was informed during this pre-sale period (1) that Nyanza had failed and “was involved in the Superfund Site in Ashland known as the Nyanza Superfund site” (Langer affidavit, ¶4); and (2) about the Commonwealth’s stated proposal in 1985 to include Derby on a list of PRPs connected to the Nyanza site, and its subsequent communication in 1986 that it had no present intention to name Derby as a PRP (Langer affidavit, ¶6).[7]
Before the sale transaction took place, RohmTech hired an environmental consulting firm, Briggs Asso *618 ciates, Inc. (Briggs), to assess the status of Derby’s operations in Fitchburg. The firm’s reports (the Briggs reports) identified some contamination in one corner of the Fitchburg property that was related to buried railroad ties. This finding gave pause to RohmTech’s intention to purchase Derby, but ultimately the parties dealt with the railroad-tie contamination through an escrow arrangement as part of the sale. It appears that Briggs did no research as part of its investigation concerning the Nyanza site in Ashland. And GP&H, as the attorneys representing the sellers in the transaction, instructed Arent Fox lawyers not to contact any governmental agencies in connection with environmental issues.[8]
On July 14, 1988, RohmTech and the stockholders of Derby — the estate of Roland Jr. and Lois Taylor (referred to collectively as the sellers) — executed a stock purchase agreement (Agreement) for the stock of Derby. The purchase price was 1.8 million dollars. In the Agreement, the sellers[9] specifically warrant as follows:
M. Litigation
(1) . . . [T]here is no suit, action, proceeding, arbitration or written claim pending against the Company [Derby],. To the knowledge of the Company, there is no suit, action, proceeding, arbitration or claim threatened against. . . the Company . . . nor does the Company have any reason to believe that there is any basis or grounds for any such suit, action, proceeding, arbitration or claim or that the Company has not complied in all material respects with or is in default in any material respect under any law, ordinance, requirement, rule, regulation or order applicable to the Company’s business . . .
Q. Environmental Matters
(1) Except as provided below [in connection with the contamination related to the railroad ties identified in the Briggs reports], to the best knowledge of the Company and the Seller, the Company has complied in all material respects with all applicable rules and regulations issued by or on behalf of the U. S. Environmental Protection Agency and Massachusetts state environmental regulatory agencies
(2) The Company has no environmentally related liability whether contingent or actual with respect to its suspended operations at Ashland, Massachusetts . . .
(Agreement, §§3(M), 3(Q).) The Agreement further provides that (1) the sellers are to “indemnify, hold harmless and defend” RohmTech for the period of one year from the closing date against any claims or liability “arising out of the violation, breach or falsity of the representations and warranties of the Seller and the Company . . .” (Agreement, §9(A)); and (2) the sellers’ representations and warranties are to survive for the one-year indemnity period (Agreement, §11(1)).
Finally, the Agreement contains a provision obligating Derby to have its accountants prepare, 'within 45 days after the closing, audited financial statements of the company as of June 30, 1988. (Agreement, §8.)[10] In connection with the preparation of these statements, on August 2, 1988, GP&H on behalf of Scott Taylor and Derby, sent a letter to Peat, Marwick Main & Co., the accountants performing the audit. The letter stated, among other things:
In the course of our representation of [Derby], we have become aware of the following:
2. The Company [Derby] was informed in August 1985, through a telephone call from the Massachusetts Attorney General’s Office to us, that the Commonwealth of Massachusetts had made an initial determination that the Company was a responsible party with respect to the Nyanza Superfund site in Ashland, Massachusetts and was considering the transmittal of a letter to that effect to the Company. Under Massachusetts and federal law, responsible parties at a Superfund site may be liable for the costs of investigating and cleaning up such site. In discussions between the Attorney General’s Office and us in 1986, the Commonwealth indicated that it had no present intention of naming the Company as a responsible party with respect to the Nyanza Superfund site. To date, we are not aware that the Company has been named a responsible party with respect to the Nyanza Superfund site. Based upon our review of the information provided to us by the Company, it appears that the Company has several substantial defenses to any assertion of liability for the investigation and clean-up costs incurred by the Commonwealth at the Nyanza site in the event the Company is ever named a responsible party.
GP&H also sent a copy of the letter to John Hushon at Arent Fox.
Approximately one year after the sale of Derby to RohmTech, Derby was merged into RohmTech.
On May 16, 1990, the United States Environmental Protection Agency (EPA) sent RohmTech a formal request for information in relation to the “Nyanza Chemical Waste Dump in Ashland, Massachusetts” pursuant to §104 of CERCLA, 42 U.S.C. §9604. (Winston affidavit, ex. F.) The request sought information about any business or professional contact between RohmTech and Nyanza, as well as between RohmTech and several other companies which had been associated with Nyanza at the Ashland site. RohmTech requested attorneys at Arent Fox to assist in responding to the information request, and paid Arent Fox for this work.
On January 22, 1991 the EPA sent written notices to RohmTech, Scott Taylor, the estate of Roland Jr. *619 and the estate of Roland Sr. that each was a PRP pursuant to CERCLA in connection with the “Nyanza Chemical Waste Dump Superfund Site.” The notice to RohmTech stated in relevant part:
EPA has evaluated a large body of evidence in connection with its investigation of the Site, including state records and corporate records, titles, RohmTech’s response to EPA’s information request of May 17,1990,... other responses to information requests, and other information.
Based on this evidence, EPA has information indicating that RohmTech is a potentially responsible party (PRP) with respect to this Site. Specifically, EPA has reason to believe that RohmTech is the successor to an owner/operator at the Site at the time of disposal of hazardous substances at the Site. By this letter, EPA notifies RohmTech of its potential liability with regard to this matter and encourages RohmTech, as a potentially responsible party, to reimburse EPA for the costs incurred to date and to voluntarily perform or finance the response activities described below that EPA has determined are required at the Site.
The notice went on to state that EPA had incurred approximately $12 million in response costs. According to RohmTech’s complaint in this action, “(b]ecause RohmTech had purchased the Ashland Site from Derby II [i.e., Derby], RohmTech understood the basis of any potential liability to arise from the transfer of potential Derby II liability to RohmTech.” (Complaint, ¶85.)
On behalf of their client RohmTech, attorneys at Arent Fox committed significant time and resources to dealing with the EPA’s notice of responsibility. RohmTech was responsible for the related legal fees and expenses.
After sending out the notices of responsibility, the EPA conducted a series of meetings with representatives of the PRPs. These began in February 1991. One or more attorneys from Arent Fox, including Katherine Nam, attended these meetings on behalf of RohmTech. Also in attendance was Paul Nightingale, an attorney at GP&H who represented Scott Taylor and the estates of Roland Sr. and Roland Jr. in connection with the EPA action. At or soon after the first meeting, the EPA informed the PRP representatives that a set of documents from the law firm of Withington, Cross, Park & Groden (Withington Cross), former counsel to Nyanza, Roland Sr. and Roland Jr., had been produced and reviewed by the EPA, and were available for all the Nyanza site PRPs to review. In early March 1991, all the Withington Cross documents were transferred to GP&H and made available to all the PRPs.
Over the course of two or three days in March 1991, Katherine Nam reviewed the Withington Cross documents in the offices of GP&H. She also reviewed public documents which Paul Nightingale had obtained from the Secretary of State concerning Nyanza, Derby and other entities involved in the Nyanza site.[11] In addition, GP&H inadvertently made available to Nam the files of Bradford Gentry, the GP&H attorney who had dealt with the Attorney General’s office in 1985-86 in connection with the Commonwealth’s possible intention of listing Derby as a PRP. (Bradford Gentry was no longer at GP&H.) As indicated above (see p. 4), the Gentry notes and documents contain a number of explicit references to the fact that the Commonwealth was pursuing a theory that Derby might be liable for the Nyanza contamination because of corporate connections between Derby and Nyanza, and specific information relating to those connections.[12]
Pursuant to her arrangement with Nightingale, after completing her review, Nam marked various documents for copying. At least some of these were copied and the copies sent to Arent Fox in April 1991. It appears that others of the documents were copied and sent to Arent Fox in October 1991.[13],[14]
Recognizing that their respective clients had virtually if not completely identical interests in relation to the EPA action, Katherine Nam and Paul Nightingale together interviewed John Ploubides, the individual who had worked with Roland Jr., served as general manager of Derby up to the point of its sale to RohmTech and who in 1991 was working for RohmTech. Nam and Nightingale then helped draft an affidavit of Ploubides to send to the EPA. The parties dispute vigorously the import and goal of the Ploubides affidavit, but it speaks for itself. (It is attached to the Nam affidavit.) A reasonable reading at least suggests that the affidavit was setting forth, albeit obliquely, certain facts designed to indicate Derby and Nyanza were not connected.
Nam left Arent Fox in October 1991 to join the EPA as an attorney-advisor. Other attorneys at Arent Fox continued to represent RohmTech in connection with the EPA’s notice of responsibility. In July 1992 a lawyer for the EPA informed RohmTech’s attorneys that the EPA’s theory of RohmTech’s liability was that Derby had been fraudulently created by or out of assets of Nyanza, and was therefore responsible for Nyanza’s environmental obligations.
RohmTech commenced an action against the Taylors in July 1994, alleging essentially the same causes of action as it brings in this suit. The 1994 litigation was dismissed by agreement of the parties. The current action was filed in March 1996.[15]
Discussion
Summary judgment is granted where there are no genuine issues of material fact, and where the record entitles the moving party to judgment as matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 429 (1983). The moving party bears the burden of demonstrating that there is no genuine issue of material fact on every relevant claim. Peterson v. Time, *620 Inc., 404 Mass. 14, 17 (1989). See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Once the moving party shows the absence of a triable issue, the opposing party must respond with specific information establishing the existence of material facts genuinely in dispute. Pederson, 404 Mass. at 17.
RohmTech’s complaint asserts claims of fraud, breach of contract, breach of the duty of good faith and fair dealing, and negligent misrepresentation. The Taylors argue that all of the claims are time-barred.' The claims are separately discussed below.
1. Fraud and Negligent Misrepresentation[16]
It is RohmTech’s position that the Taylors, as the sellers of Derby, intentionally withheld from, or negligently failed to disclose to, RohmTech the facts concerning the Commonwealth’s investigation of Derby’s potential responsibility for the Nyanza site cleanup. In particular, RohmTech argues that in negotiating the sale of Derby, the Taylors refused or failed to disclose the fact that the Commonwealth had never released Derby from a possible claim that Derby and Nyanza were sufficiently corporately interconnected to make Derby liable for Nyanza’s hazardous waste; and that the Taylors’ knowledge about the Commonwealth’s potential claim against Derby also made the representations and warranties in the Agreement false. RohmTech finally contends that the fraudulent withholding and the false representations were intended to and did induce RohmTech to enter into the Agreement.
There is no dispute that these are tort claims and the applicable statute of limitations is three years. G.L.c. 260, §2A. The question raised by the Taylors’ limitations defense is when the statute began to run, or, put another way, when did RohmTech’s cause of action for fraud and negligent misrepresentation accrue. See Bowen v. Eli Lilly & Co., 408 Mass. 204, 205-06 (1990). A cause of action accrues in a misrepresentation case when the alleged misrepresentation is discovered or reasonably should have been discovered, whichever occurs earlier, and there is a “necessary coalescence of discovery and appreciable harm.” Murphy v. Smith, 411 Mass. 133, 136 (1995), quoting Cantu v. St. Paul Cos., 401 Mass. 53, 57 (1987). See generally Bowen v. Eli Lilly & Co., supra at 205-06 (crucial for defining when the statute of limitations begins to rim is “the date when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant’s conduct”).
The uncontroverted facts in the summary judgment record make it clear that RohmTech knew or reasonably should have discovered that it may have been harmed by the Taylors’ allegedly false representations about the absence of environmental problems related to the Nyanza site by January 1991, when RohmTech received the notice of PRP status from the EPA.[17] The notice indicated that the EPA was prepared to hold RohmTech responsible for clean-up costs, then totaling $12,000,000, because it believed RohmTech was the successor to an owner/operator at the site. Rohm-Tech certainly knew that its connection, if any, to the site was through Derby, and the EPA’s notice at the least should have alerted RohmTech to the likely possibility that the representations and warranties in §§3(M)(1) and 3(Q)(2) of the Agreement might well be false: the representations stated there were no pending or threatened claims against Derby and no environmental liability, and here was the Federal government asserting a claim that based on the information it had collected and reviewed, nonetheless, RohmTech (through Derby) was potentially responsible for all the clean-up costs at the Nyanza site. At that point in time, the alleged misrepresentations were no longer “inherently unknowable,” and, because Rohm-Tech had also suffered “appreciable harm,” in at least the form of retaining counsel and incurring legal fees in connection with the EPA’s notice,[18] its cause of action against the Taylors accrued. See Murphy v. Smith, supra, 411 Mass. at 136.[19] See also Hanson Housing Auth’y v. Dryvit System, Inc., 29 Mass.App.Ct. 440, 446 (1990). This is especially so because indeed, RohmTech, through its counsel, had received written notice two and one-half years earlier, in August 1988, that in 1985 the Commonwealth had also “made an initial determination that [Derby] was a responsible parly with respect to the Nyanza Superfund site ...” (Winston affidavit, ex. E.)[20]
RohmTech argues that the EPA’s notice did not reasonably put it on notice about the purported misrepresentations by the Taylors because neither the notice nor the EPA explained specifically the theory of liability on which it was intending to proceed, and “everybody” — Including Scott Taylor and lawyers from GP&H — told RohmTech that the theory was tied to the chemicals found on the site or the fact that Derby had operated at the site in the past. Since, in RohmTech’s view, no liability could realistically be premised on either of these two theories, RohmTech had no reason to suspect a problem with the accuracy of the Taylors’ representations in the Agreement. In fact, RohmTech asserts that its claim against the Taylors was “inherently unknowable” until July of 1992, when the EPA lawyer articulated in direct terms that the agency’s theory of liability was based on a claim that Derby was Nyanza’s corporate successor due to the intertwined nature of the two companies’ relationship. That was the first point at which RohmTech states it reasonably should have recognized it was harmed on account of the Taylors’ conduct.
The argument fails. As indicated above, what matters for statute of limitations purposes is the date when RohmTech, “reacting to any suspicious circumstances of which [it] might have been aware,”[21] should reasonably have been put on notice that it may have been harmed by the alleged misrepresentation of the Taylors. Bowen v. Eli Lilly & Co., supra, 408 Mass. at 207, 208. Accord, Cambridge Plating Co. v. Napco, Inc., *621 991 F.2d 21, 25, 27 (1st Cir. 1993); Hanson Housing Auth’y v. Dryvit System, Inc., supra, 29 Mass.App.Ct. at 446. The “notice” required is not notice of all facts on which the cause of action might ultimately be based. “The controlling question is whether a plaintiffs knowledge, actual or attributed, of both harm to it and the likely cause of such harm is sufficient to stimulate further inquiry which was likely to alert it to a cause of action against a defendant.” Id. At that point, the plaintiff must itself undertake to investigate available sources of information, or suffer the consequences. See American Glue & Resin v. Air Products and Chem., 835 F.Sup. 36, 45 (D.Mass 1993). See also Friedman v. Jablonski, 371 Mass. 482, 486 (1976) (plaintiffs claim that defendant seller had misrepresented existence of right of way was time barred because as of the time of the closing the plaintiffs could have taken steps to determine from available information — e.g., a title search, inspection of government records — to discover the alleged misrepresentation on the defendant’s part, and plaintiffs must accept the consequences of their failure to do so).
Of course, further inquiry is exactly what RohmTech was stimulated to undertake upon receipt of the EPA notice of responsibility: beginning in February 1991, on RohmTech’s behalf, Katherine Nam of the law firm of Arent Fox participated in the EPA’s steering committee, and in March 1991, she undertook to review the Withington Cross documents relating to Nyanza which the EPA had made available. The documents contained quite substantial information suggesting close corporate links between Nyanza and Derby, and reasonably should have put RohmTech on notice that this was a potential ground for liability available to the EPA to assert.[22] That there were multiple boxes of Withington Cross documents to go through — Katherine Nam’s lament — simply does not afford a legally cognizable basis to excuse RohmTech’s failure to recognize this potential. RohmTech could not, at that point, lay claim to a state of “blameless ignorance”[23] that would be necessary to prevent the limitations period from running. See Cambridge Plating Co. v. Napco, Inc., supra, 991 F.2d at 28 (while plaintiffs reasonable but ultimately unsuccessful efforts to discover cause of harm will not be fatal for statute of limitations purposes, the statute is not tolled pending confirmation of the details of plaintiffs injury or its cause).[24]
Moreover, as the Taylors point out, for purposes of applying the discovery rule, “the unknown factor . . . must be what the facts are, not the legal theory for the cause of action.” Gore v. Daniel O’Connell's Sons, Inc., 17 Mass.App.Ct. 645, 647 (1984). See White v. Peabody Consrt. Co., 386 Mass. 121, 129-30 (1982). RohmTech characterizes as a “fact” the EPA lawyer’s articulation of its theory that Derby was created by a fraudulent transfer from Nyanza. Clearly this is theory, not fact. As for facts, the record demonstrates that by January 1991 (and certainly by March of 1991) the information available to RohmTech included: (1) the EPA was asserting a significant claim of liability for the Nyanza site clean-up based on RohmTech’s status as a successor to Derby; (2) the Commonwealth had earlier intended to assert a similar claim of responsibility against Derby; (3) Derby had a variety of connections to Nyanza including original common ownership and other interrelationships which linked the two corporations together; and (4) despite all this, the Taylors had warranted in the Agreement that no actual or potential environmental liability existed, a representation which according to RohmTech was a lynchpin in its decision to go forward with the purchase of Derby, because if RohmTech had know of the environmental claim it would. have abandoned the purchase and sale negotiations immediately. This was more than enough to enable RohmTech to recognize that an injury had occurred, and that the Taylors were the likely cause. By waiting until July 13, 1994 to bring this litigation, RohmTech waited too long. The statute of limitations on its fraud and misrepresentation claims had run.
2. Breach of Contract.
RohmTech’s second claim is that the Taylors breached the Agreement because the Agreement’s representations and warranties about the absence of claims and environmental liability connected to the Nyanza site were false. The Taylors respond that any cause of action based on these warranties is barred by the one-year limitations period incorporated into the Agreement as an express contractual term. See Agreement, §§9(A), 11(1).[25] The rejoinder from RohmTech is that the Taylors are estopped from relying on the one year warranty limitation because they fraudulently induced RohmTech to enter into the Agreement based on allegedly false representations of a separation between Derby and Nyanza and a clean environmental slate.[26]
Parties may validly agree in a contract to a shorter limitations period for the assertion of claims based on contractual representations and warranties than is otherwise granted by statutory limitations provisions. See, e.g., Reynolds Indus. v. Mobil Oil Corp., 618 F.Sup. 419, 422 (D.Mass. 1985). See also Hays v. Mobil Oil Corp., 930 F.2d 96, 100 (1st Cir. 1991). Cf. Greenery Rehabilitation Group v. Antaramian, 36 Mass.App.Ct. 73, 75-76 (1994) (provision in real estate agreement denying survival of any representations and warranties beyond the closing date). But RohmTech is correct that such contractual terms may not defeat a claim that a contracting party has fraudulently used false representations and warranties to induce another to enter into the agreement. See, e.g., Vmark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 619 n.11 (1994), and cases cited.
It is true, as RohmTech urges that “[a] person is estopped from denying the consequences of his con *622 duct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made." Bergeron v. Mansour, 152 F.2d 27, 30 (1st Cir. 1945). But application of the rule to this case does not afford RohmTech relief. The difficulty is that the remedy available to such a party is to avoid the contract and assert an independent claim of misrepresentation or deceit. See Arthur D. Little Int’l v. Dooyang Corp., 928 F.Sup. 1189, 1201, 1204-05 (D.Mass. 1996). See also McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 712-13 (1990); Bates v. Southgate, 308 Mass. 170, 182 (1941). RohmTech actually pursued this avenue in the present case, but for the reasons discussed above, the route is closed by the applicable tort statute of limitations.[27]
3. Breach of the Implied Covenant of Good Faith and Fair Dealing
RohmTech’s remaining claim is that the Taylors breached the implied covenant of good faith and fair dealing. As the complaint makes plain, the factual premise of this claim is also the alleged refusal of the Taylors to disclose material information about environmental liabilities during the negotiation of the sale transaction, and their incorporation of false representations and warranties into the Agreement. (Complaint, ¶121.)
In light of its basis, the claim fails as matter of law. “[T)he implied covenant of good faith and fair dealing pertains to bad faith in the performance of a contract, not in its execution.” Sheehy v. Lipton Indus., 24 Mass.App.Ct. 188, 194 n. 6 (1981). RohmTech has not raised a complaint about performance. Compare Cambridge Plating Co., Inc. v. Napco, Inc., 876 F.Sup. 326, 337 (D.Mass. 1995), aff'd in part and vacated in part, 85 F.3d 752 (1st Cir. 1996).
D. Claims against Scott Taylor
RohmTech asserts its claims against Scott Taylor (1) in his capacity as the administrator of the estate of Roland Jr., the estate being one of the sellers of Derby, and its representative being one of the Agreement’s signatories;[28] and (2) individually. With respect to Taylor as administrator, the claims are barred by the one-year statute of limitations applicable to actions against the legal representative of an estate, G.L.c. 260, §11. While RohmTech correctly argues that the discovery rule applies to such actions, see Graveline v. BayBank Valley Trust Co., 19 Mass.App.Ct. 253, 254-56 (1985), once the cause of action accrues, the action must be brought within a year. See id. Here, RohmTech’s cause of action against the estate representative accrued no later than January 1991, for reasons set out above. This action was not commenced until more than three years thereafter.[29]
As for claims against Scott Taylor individually, Taylor contends they must be rejected as matter of law. The argument is that Taylor executed the Agreement as president of Derby, and an agent or officer who enters into a contract on behalf of a corporation or other disclosed principal does not become individually liable on the contract. See Restatement (Second) of Agency, §328 (1958).
I do not need to address this contention. Even if Scott Taylor could be held individually liable for breach of contract or fraud, the same reasons which preclude RohmTech from maintaining its tort and contract claims against Lois Taylor and Scott Taylor as administrator of Roland Jr.’s estate also work to bar the claims against of Scott Taylor as an individual: the pertinent statutes of limitations, both statutory and contractual, have run.
ORDER
For the foregoing reasons, the motion for summary judgment of the defendants Scott Derby Taylor and Lois Ann Taylor is allowed.

 The defendant Scott Derby Taylor is currently the administrator of the estate of Roland Derby, Jr. He is sued in that representative capacity as well as individually.

 Scott Derby Taylor is the son of Lois Taylor and the nephew of Roland, Jr.

 See G.L.c. 21E, §4. Potentially responsible parties are responsible for the cost of investigating and cleaning up such a site.

 Although the affidavit of Ekkegard Grampp states that Scott Taylor “assured [Grampp] that Derby . . . had no environmental liabilities” (¶ 18), this statement is not inconsistent with the statements by Langer in his own affidavit concerning Taylor’s statements about the original common ownership of Derby and Nyanza through Roland Jr. and the common location. Accordingly, I consider Langer’s statements described here to be uncontroverted.

 Langer states in his affidavit that “RohmTech and I were aware” and “RohmTech and I were informed” before the sale of Derby of the facts stated in the text about both the status of the Nyanza site as a Superfund site and the Commonwealth’s actions in 1985 and 1986 concerning the naming of Derby as a PRP in connection with the Nyanza site. (Langer affidavit, ¶¶4, 6.) Grampp in his affidavit states that “[njeither the Sellers nor their counsel informed me, RohmT-ech, or anyone from Rohm, prior to the closing transaction ...” about the Commonwealth’s intention at first to name Derby as a PRP or its later intention not to do so for the present. (Grampp affidavit, ¶32.) (Grampp does not deny or indeed address the Superfund site question.) It is clear that neither Langer nor Grampp can permissibly state as a factual matter whether or not “RohmTech” or “Rohm” was aware or informed of anything; affidavits under Rule 56 must state facts based only on personal knowledge. See, e.g., Madsen v. Erwin, 395 Mass. 715, 719, 721 (1985). Reading the two affidavits together, I conclude, for purposes of the summary judgment motion alone, there is no dispute that Scott Taylor or other representatives of Derby told Langer about the Commonwealth’s earlier communications concerning Derby’s possible PRP status, but did not tell Grampp. On the other hand, the defendants are correct that Langer was clearly operating as the agent of RohmTech in connection with the sale transaction, and information imparted to him is to be considered as imparted to RohmTech. See Restatement (second) of Agency, §272 (1958) (liability of principal is affected by the knowledge of its agent concerning matter on which *623 agent acts to bind the principal or upon which agent has duly to give information to principal). Cf. Castillo v. Massachusetts Gen. Hosp. Chelsea Memorial Health Care Center, 38 Mass.App.Ct. 513, 518 n.7 (1995).

 According to the lawyer John Hushon from Arent Fox, the GP&H attorneys instructed in substance as follows: “Given the fact that we did not have a definitive agreement and it was by — certainly not the case that the acquisition would [definitely] close, that RohmTech and its representatives were not to raise any needless issues with any government agencies which could operate to the detriment of Derby subsequently if the acquisition did not go forward.” (Hushon deposition, p. 146; see id. p. 143 [Appel affidavit, ex. I].)

 While some of the representations and warranties in the Agreement are stated as being made by Derby rather than the sellers, the Agreement makes the sellers alone liable for any breaches or falsity of the warranties. (Agreement, §9(A).) As a practical matter, therefore, the warranties are made solely by the sellers.

 The purpose of these post-closing financial statements was to permit an adjustment in the purchase price if the statements showed that Derby’s net worth was significantly different than that reflected in its audited balance sheet of June 30, 1987.

 Nightingale reviewed all the Withington Cross documents and public records he had obtained in early March 1991, before Nam conducted her review. Nightingale states in his affidavit that these documents included: references to Roland Jr.’s common ownership of Nyanza and Derby in the 1970s and to Nyanza’s large potential environmental liability in the 1970s; Nyanza income tax returns indicating negative Nyanza income from 1974-77; a 1977 corporate tax return of Nyanza’s listing Derby and Nyanza as part of a controlled group under the tax code; joint letterhead for both Derby and Nyanza signed by Roland Jr. simply as “President”; and a 1977 Derby financial statement listing a lease with Nyanza as a transaction with an affiliated company. (Nightingale affidavit, ¶9.) The documents themselves are not included in the summary judgment record, but RohmTech, which presumably has reviewed all the documents in question at least since the commencement of this action, does not dispute Nightingale’s partial listing of contents.

 A number of the Gentry notes concern telephone conversations he had with Raymond Dougan, then the Assistant Attorney General with whom Gentry was dealing in relation to the Commonwealth’s possible naming of Derby as a PRP. The notes contain, inter alia, these entries: “corporate connections w/others @ site”; “Scott Taylor’s name on some related Nyanza paper in late 70s”; “dug into files from couple years back . . . checked parties who were on site, TDC [The Derby Company] popped up, ran thru AG’s/C’wlth’s records, TDC come up in ‘interesting’ ways also Nyanza”; “a Derby Co. op’d as wholly owned sub of Nyanza, set up by Roland Jr., Business in 70s related to Nyanza on site, a Derby Co. listed in No. Andover phonebook @ address other Nyanza co’s listed @, stmnt from Sec’y of state listing @ Lawrence (NY) & @ Ahsland, also dirs. of Derby Co. ass’d w/Nyanza or other co."; “all infor connects DC [Derby Company] to Nyanza or con-stella of co’s ass’d w/Nyanza”; “are pressing piercing/succ’r cases now.” (Appel affidavit, ex. E, F.)
Other notes relate to a conversation between Gentry and Scott Taylor. These include statements that “Nyanza owned by 5 diff owners, Derbys the last owners"; “had to put effl. trtmnt in, used mercury, etc. as catalysts — don’t go away, mitrobenzenes, etc . . . ;” “Nyanza got into trouble, 2 parts that cld make $ reconstituted, spun off Derby Co. — reconstituted— polymer business”; “creds never penetrated Derby, Nyacol to recover claims ag Nyanza, not sure ever tried”; “little of this stuff still exists — no way to prove were/weren’t same co.”; “not same prods, management, people, pd rent, not on bds, same outside bookkeepers, books separate, sep. vp, Roland not really running either, pres of both in title, formed by pres, 80% s/L, never Nyanza, completely separate entity”; Withington Cross + Ploubides only alive"; “not sure re: files, how far.” (Appel affidavit, ex. G.)
Finally, the Gentry materials include a memorandum to the file from Bradford Gentry, dated August 27, 1985 and entitled “Derby/Nyanza Conflict Issues.” This memorandum concerns the potential conflicts of interest between and among Derby, Scott Taylor, Lois Taylor and her husband in relation to any effort by the Commonwealth to impose liability on any or all of them for the Nyanza site cleanup; the focus of the inquiry is whether GP&H could represent all of them without confronting impermissible conflicts. The memorandum includes the statement that “Derby has been contacted by Ray Duggan [sic.] at the Massachusetts Attorney General’s Office concerning the Nyanza clean-up. Ray indicated that Derby was now considered to be a potentially responsible party and that it would be receiving a notice letter in the relatively near future ... Derby may have used chemicals on the site, which chemicals may be found in the soil or ground water; may have been an operator of the site by operating a manufacturing facility on the premises; or may have been closely related enough to the Nyanza Company to allow the two companies to be considered as one. Scott may have been the lessor or owner of certain land which Derby leased; was the President of Nyanza for a short peri[o]d of time during Nyanza’s liquidation; and is the President of Derby. Lois and Bill could, at least theoretically, be targeted in their capacities as shareholder or directors of Derby." (Winston affidavit, ex. C, Memorandum To The File, pp. 2-3.)

 Katherine Nam states in her affidavit that “[bjecause I went through ‘tens of thousands of documents’ more than six years ago, I simply do not recall whether I saw any of the documents referred to as the ‘Brad Gentry’ documents.” (Nam affidavit, ¶21.) However, RohmTech’s answers to interrogatories make clear that RohmTech had copies of the Gentry documents in its possession before commencing this litigation. (Winston affidavit, ex. B, response to interrogatory 11.) The summary judgment materials indicate that Nam was the person from Arent Fox who reviewed documents at the offices of GP&H in March 1991 (see Fleischaker deposition, p. 123 [Winston affidavit, ex. I]), and Nightingale states that the Gentry file was inadvertently shown to her at that time. (Nightingale affidavit, ¶¶14, 15; see also Dillon deposition, pp. 98-99 [Appel affidavit, ex. K].j RohmTech offers nothing to contradict this fact. Its principal dispute about the Gentry file appears to concern the date in 1991 — April or October — they were sent to Arent Fox.

 There is a dispute between Nightingale and Nam about the contents of their conversations in the late winter and spring of 1991 as they were working together in preparing a response to the PRP notifications that their respective clients had received. (Compare affidavits of Paul Nightingale and Katherine Nam [although much of Nam’s affidavit consists of material that is not appropriately considered in a Rule 56 affidavit].) Nam asserts Nightingale maintained that Derby and Nyanza were distinct and separate companies, and since he assured her this was so, she had no reason to question whether they were separate. (Nam affidavit, ¶24.) (See also deposition of Marc L. Fleishchaker, another attorney at Arent Fox [Appel affidavit, ex. J, p. 95] [stating that during 1991, Arent Fox discussed the basis for RohmTech’s liability and was told by the EPA as well as Nightingale that the basis was only as a lessee or contributor to the pollution, and since RohmTech was satisfied that Derby did not contribute to the pollution, it had no reason to believe there was any problem].) Nightingale, on the other hand, states that based on his review of the Withington Cross and public documents, he told Nam in March 1991 “that the EPA was very likely asserting that Derby was liable for Nyanza’s contamination as a corpo *624 rate successor to Nyanza.” (Nightingale affidavit, ¶10.) I do not consider this factual dispute to be material to disposition of the summary judgment motion. On the assumption that Nightingale did not state to Nam his supposition about the EPA’s theory, in March 1991 Nam had a full opportunity to review all the Withington Cross and Secretary of State public documents as well as, it appears, the Gentry file. In other words, in March of 1991 Nightingale was not the sole source of information available to Arent Fox and RohmTech on the topic of corporate connections between Nyanza and Derby.

 On account of the first action, the parties agree that for purposes of considering the statute of limitations issues raised by the summary judgment motion, this litigation should be considered as having been commenced on July 13, 1994.

 RohmTech asserts these two claims separately as Counts I and IV of its complaint. Analytically, the claims present the same issues in connection with the statute of limitations defense.

 The Taylors appear to contend that the triggering date for the statute of limitations was August 2, 1988, when GP&H sent RohmTech’s counsel a copy of its letter which describes the 1985 communications between GP&H and the Attorney General’s office about Derby’s possible naming as a PRP; alternatively, the Taylors suggest May 1990, when RohmTech received the EPA’s request for information about connections to Nyanza among other companies operating at the Nyanza site. It is not necessary to resolve the argument, since I conclude that in any event the notice sent by the EPA in January 1991 did start the limitations clock running.

 See Cantu v. St. Paul Cos., 401 Mass. 53, 55-56 (1987); Massachusetts Electric Co. v. Fletcher, Tilton & Whipple, P.C., 394 Mass. 265, 268 (1985). See also Salin v. Shalgian, 18 Mass.App.Ct. 467, 469 (1984).

 Murphy is instructive. In that case, the defendant attorney gave the plaintiffs, whose interests he was representing, a certificate of good record title to a properly lot they were purchasing. Three years later, an attorney representing the plaintiffs’ neighbors sent the plaintiffs a letter which stated that his clients were the true owners of the lot. Noting the rule that a cause of action accrues against an attorney for negligent misrepresentation in certifying a title when the misrepresentation is or reasonably should have been discovered, the court concluded that when the plaintiffs received the letter from their neighbors’ lawyer that the neighbors were asserting a legal right to the property, “the plaintiffs had sufficient notice of the facts to make the defendant’s alleged negligence no longer inherently unknowable.” Murphy v. Smith, 411 Mass. 133, 136 (1995). The court ultimately held, however, that in Murphy the cause of action did not accrue against the defendant attorney at that time because the continuing representation rule tolled the limitations period until the defendant’s representation of the plaintiffs had ceased. There is and can be no claim analogous to the continuing representation rule in this case; the Taylors are not lawyers, they never purported to represent RohmTech, and the sale itself had been completed long ago.

 In addition, Jake Langer, the controller of RohmTech had received information pertinent to the EPA’s claim before the sale of Derby took place. (See pp. 5-6 above.)

 Malapanis v. Shirazi, 21 Mass.App.Ct. 378, 382-83 (1986).

 The Gentry file adds more details, and also makes clear that the Taylors, through counsel, were aware in 1985 that the government was considering a theory of liability based on corporate interconnections. Although I consider the record to demonstrate with reasonable clarity the Gentry notes and documents were made available to Katherine Nam in March of 1991, I do not base my decision on this fact. For the reasons stated above, for statute of limitations purposes, RohmTech was on sufficient notice that it may have been harmed by the Taylors’ claimed false representations as of the date RohmTech received the EPA notice of responsibility. The Withington Cross documents and the Gentry notes offer potentially useful information that might be used to prove RohmTech’s cause of action against the Taylors, but the details they provide were not essential or even necessary to put RohmTech on notice it had a claim in the first instance. See White v. Peabody Const. Co, Inc., 386 Mass. 121, 130 (1982) (notice for statute of limitations means notice of claim itself, not notice of every fact that must ultimately be proved to support the claim). Accord, Hanson Housing Auth’y v. Dryvit System, Inc., 29 Mass.App.Ct. 440, 445 (1990).

 Urie v. Thompson, 337 U.S. 163, 170 (1949), quoted in, for example, Friedman v. Jablonski, 371 Mass. 482, 485, 486 (1976), and Hanson Housing Auth’y v. Dryvit System Inc., supra, 29 Mass.App.Ct. at 447.

 RohmTech appears to stress the fact that in 1988, before the sale of Derby was consummated, GP&H had directed RohmTech’s attorneys to refrain from contacting the Attorney General or any environmental agencies about the Nyanza site; the point seems to be that RohmTech was deliberately kept off the right track in terms of discovering anything that might help it understand the basis of the EPA’s complaints. Whatever direction GP&H may have given in 1988 before the sale clearly did not apply once the sale of Derby went through. There was no fiduciaiy relationship between RohmTech and the Taylors, and after the sale RohmTech was free to pursue any investigatory leads and sources that were reasonably available, including the Massachusetts Attorney General’s office.

 Section 9(A) provides in relevant part;
For the period ending on the first anniversary of the Closing Date [July 14, 1988], the Seller shall indemnify, hold harmless and defend the Purchaser from and against any and all claims . . . now or hereafter arising out of the violation, breach or falsity of the representations and warranties of the Seller and the Company . . .
Section 11(1) reads:
The representations, warranties, indemnities and agreements of the parties contained in this Agreement, or any document or certificate delivered pursuant to the provisions of, or in connection with, this Agreement shall survive the making of this Agreement, any examination made by or on behalf of the parties hereto and the Closing hereunder for the period specified in Section 9 above.

 RohmTech does not dispute that §§9(A) and 11(1) of the Agreement prescribe a shortened limitations period for asserting claims based on the contractual representations and warranties.

 Recision is the one possible contractual remedy that might be available to a party in RohmTech’s position. See Solomon v. Birger, 19 Mass.App.Ct. 634, 638 (1985). But RohmTech did not seek this type of relief, and the timing was not favorable to asserting such a claim in any event. See id., and cases cited.

 The Agreement was executed by John Groden as executor of the estate of Roland Jr. The record does not explain the devolution of responsibility to serve as the estate’s representative from John Groden as executor to Scott Taylor as administrator. However, no one appears to disagree that Scott Taylor is now serving in that capacity.

 RohmTech contends the one-year statute of limitations is preempted by CERCLA, 42 U.S.C. §9601 et seq. Aside from the fact that RohmTech asserts no claim under CERCLA in this action, and that preemption is questionable, see Witco Corp. v. Beekhuis, 38 F.3d 682, 684 (3d Cir. 1994), RohmTech’s delay of over three years would bar action under *625 CERCLA in any event. CERCLA has a three-year statute of limitations.