Sweeney, J.
The Defendant, Monsignor Frederick J. Ryan, moves for summary judgment on the grounds that the plaintiffs first amended complaint is barred by the applicable statute of limitations, G.L.c. 260, §4C. For the reasons stated herein, the defendant’s motion is denied.
General Laws c. 260, §4C provides:
Actions for assault and battery alleging the defendant sexually abused a minor shall be commenced within three years of the acts alleged to have caused an injuiy or condition or within three years of the time the victim discovered or reasonably should have discovered that an emotional or psychological injuiy or condition was caused by said act, whichever period expires later; provided, however, that the time limit for commencement of an action commenced under this section is tolled for a child until the child reaches eighteen years of age.
The plaintiff was bom on April 19, 1966. He commenced this action on April 5, 2002 (fourteen days shy of his 36th birthday). In his first amended complaint, Mr. Carney claims that Monsignor Ryan raped and otherwise sexually abused him on three occasions during the school year of September 1981 to June 1982. Monsignor Ryan denies the allegations, but for puiposes of this Rule 56 motion for summaiy judgment, he states that, even if the allegations were true, the plaintiffs’ action for monetary damages is time-barred. In response, the plaintiff claims that he did not discover that he was appreciably injured by Monsignor Ryan’s alleged sexual molestation of him until March 2002. The plaintiff thus argues that his action is timely under the portion of the statute permitting actions to be commenced “within three years of the time the victim discovered or reasonably should have discovered that an emotional or psychological condition was caused by” the act of abuse.
1. Background
The plaintiffs’ allegations are summarized as follows. The plaintiff enrolled as a freshman at Catholic Memorial High School (“Catholic Memorial”) in the fall of 1981 at the age of 15. At that time, Monsignor Ryan was the chaplain of Catholic Memorial, as well as the Vice Chancellor of the Archdiocese of Boston. During his freshman year, Mr. Carney played on several varsity sports teams, including the football team and the hockey team. On several occasions, Monsignor Ryan offered Mr. Carney rides home from football practice. Mr. Carney accepted some rides home from Monsignor Ryan. During one of those rides, Monsignor Ryan invited Mr. Carney out to dinner, and Mr. Carney accepted. After dinner Monsignor Ryan took Mr. Carney back to the chanceiy where Monsignor Ryan resided, in order to show Mr. Carney sports memorabilia that Monsignor Ryan possessed. Peter Nilan, a well-known professional hockey player whom Mr. Carney admired, is an alumnus of Catholic Memorial, and Monsignor Ryan informed Mr. Carney that he owned Nilan memorabilia. At the chanceiy, Monsignor Ryan showed Mr. Carney a hockey jersey, and asked if Mr. Carney wanted to tiy it on. Mr. Carney said that he did, and changed into the jersey and a pair of hockey shorts. Monsignor Ryan then asked Mr. Carney to pose in the position of the “Thinker.” While adjusting Mr. Carney’s pose, Monsignor Ryan put his hand in Mr. Carney’s pants and touched his genitals. Mr. Carney told Monsignor Ryan to take him home, and Monsignor Ryan complied.
Mr. Carney next alleges that Monsignor Ryan invited him to dinner on a subsequent occasion, and Mr. Carney accepted. After that second dinner, Monsignor Ryan again took Mr. Carney back to Monsignor Ryan’s residence at the chanceiy, where he served Mr. Carney beer. Monsignor Ryan then showed Mr. Carney pictures of Gary Garland, who was at that time a junior at Catholic Memorial. Mr. Carney was able to see Mr. Garland’s tattoo in the picture. Monsignor Ryan offered to draw a tattoo on Mr. Carney’s back, and Mr. Carney agreed. Monsignor Ryan then proceeded to fondle Mr. Carney’s genitals and take nude, sexually explicit photographs of him.
Finally, Mr. Carney alleges that Monsignor Ryan took him and another minor boy on an overnight trip to Rhode Island to get a tattoo in mid-November 1981. At the tattoo parlor, Monsignor Ryan chose, and paid for, Mr. Carney to get a tattoo of a devil wearing a diaper. Afterwards, Monsignor Ryan took the two boys to a liquor store, where Monsignor Ryan purchased beer and wine. Monsignor Ryan then took the two boys to a nearby motel. At some point, Monsignor Ryan summoned Mr. Carney into the bathroom under the guise of checking on his tattoo. While adjusting Mr. Carney’s bandages, Monsignor Ryan proceeded to fondle Mr. Carney’s genitals and initiate oral sex upon him. Mr. Carney left the bathroom before Monsignor Ryan could continue. Later that night, after Monsignor Ryan fell asleep on his motel room bed, Mr. Carney, who was angiy at the events that had transpired, urinated on the bed next to Monsignor Ryan.
Subsequent to the three alleged incidents of abuse, Mr. Carney lost interest in hockey, became withdrawn from friends and family, and in June 1982 dropped *5 out of Catholic Memorial in an effort to avoid further contact with Monsignor Ryan. In the decades since the alleged abuse, Mr. Carney has struggled with addictions to alcohol and cocaine; repeated criminal infractions, including three convictions for operating a vehicle under the influence of alcohol; difficulty holding jobs; and troubled personal relationships.
One morning in March 2002, Mr. Carney saw Gaiy Garland and Monsignor Ryan on television, discussing Mr. Garland’s claim that he had been sexually abused by Monsignor Ryan. Upon viewing this news story, Mr. Carney became upset and began to cry. He informed his fiancee that Monsignor Ryan had sexually abused him as well. Throughout that day and for several weeks afterwards, Mr. Carney suffered from insomnia, increased drinking, extreme anger, and suicidal thoughts. Mr. Carney continues to be preoccupied with his memories of the abuse and to struggle with feelings of anger and guilt.
2. Appreciable Harm
The court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party. “When considering a motion for summary judgment. The judge should not consider the credibility of the witnesses or the weight of the evidence, nor should the judge make findings of fact.” Riley v. Presnell, 409 Mass. 239, 244 (1991).
“Where a defendant raises the statute of limitations, [the court] must determine if a material question of fact exists as to whether the plaintiff had (1) knowledge or sufficient notice that he was harmed and (2) knowledge or sufficient notice of what the cause of the harm was.” Ross v. Garabedian, 433 Mass. 360, 363 (2001) (internal citations omitted). The court must inquire whether a reasonable person in the plaintiffs position would have discovered the harm and the cause of the harm. See Phinney v. Morgan, 39 Mass.App.Ct. 202, 208 (1995); Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990). “One need not apprehend the full extent or nature of an injury in order for a cause of action to accrue.” Phinney at 208.
Monsignor Ryan argues that Mr. Carney knew, at the time of the abuse and thereafter, that he was appreciably injured by Monsignor Ryan’s alleged sexual molestation of him, and that Mr. Carney’s claim is therefore barred by the statute of limitations established by G.L.c. 4C.[3] In support of this argument, Monsignor Ryan points to sections of Mr. Carney’s deposition in which Mr. Carney related the alleged acts of abuse in fine detail, testified that he never forgot those events, and acknowledged that he was angry about the alleged abuse when it happened and in the subsequent months and years:
Q: You were hurt and felt betrayed at the time and you never forgot those events?
A: I haven’t forgotten them. I pushed them down after many years. It is either that or not move on with your life. You know it is there. I don’t know. I wish I did come out with it. It would have been a fuckin’ lot easier on me. I wish I had told my mother and father.
Q: You knew things that you were doing were related to that?
A: Well, I knew I was angry. I was angry for the reason that he took me away from my fuckin’ school. I didn’t want to go anymore. I left CM. He took a lot away from me.
Q: Where did you go?
A: I went to Dedham High School.
Q: You flunked out of CM?
A. Yes.
Later in the deposition, Mr. Carney testified that over the years he has suffered bouts of sleeplessness and sleep interruption, where he would awaken “thinking about it.” In this context, he testified:
Q: And it has been this way—
A: It’s been going on for years.
Q: It didn’t just start?
A: It didn’t just start, no. There could be some times when probably something took place, you went and bought a new car or a new boat, so maybe for that portion of the day or maybe that week it isn’t there, but you know you’re not that far away from it.
Monsignor Ryan claims that Mr. Carney’s anger and other mental and emotional suffering constituted appreciable harm. Monsignor Ryan further argues that the above exchanges demonstrate Mr. Carney’s awareness that he had suffered appreciable harm at the time of the abuse or soon thereafter.
In Ross v Garabedian, 433 Mass. 360 (2001), the plaintiff, who was sexually abused as a teenager, brought an action against his abuser more than 30 years after the abuse occurred. The abuse, which took place over a period of two years, created in the plaintiff feelings of guilt and shame, and a sense that the activities were wrong. Id. at 361. During the 30 years following the abuse, the “plaintiff experienced numerous failed relationships and suffered from psychological and emotional difficulties.” Id. The Supreme Judicial Court rejected the defendant’s argument that the feelings of guilt and shame experienced by the plaintiff while the abuse was ongoing constituted appreciable harm:
[T]hat the plaintiff knew his conduct was shameful and wrong does not “provide [him] with the modicum of knowledge required to trigger the statute of *6 limitationfs).” Phinney v. Morgan, [39 Mass.App.Ct. 203, 209 (1995)]. A rational finder of fact could find that the plaintiff, a teenager at the time, felt shame or a sense of wrong because his conduct was contrary to accepted church or family morals, but he was not aware that he had suffered any appreciable or legally recognizable harm.
Ross, 433 Mass. at 366.
Similarly, in Armstrong v. Lamy, 938 F.Sup. 1018 (D.Mass. 1996), the court rejected the defendant’s argument that the plaintiffs feelings of fear, nervousness, discomfort, and physical pain at the time of the abuse constituted appreciable harm. In denying the defendant’s motion for summary judgment, the court wrote that “any evidence that [the plaintiff] was ‘uncomfortable’ or refused to participate in some aspect of the sexual contact, is not enough to support a decision, as a matter of law, that he suffered an ‘injury,’ or to determine that beyond genuine dispute [the plaintiff] knew or should have known he had been harmed.” Id. at 1040, quoted with approval in Ross at 365.
Here, as in Ross and Armstrong, the evidence of the plaintiffs bad feelings at the time of the abuse and thereafter are not enough to support a decision, as a matter of law, that he knew or reasonably should have known that he had suffered appreciable harm. Although Mr. Carney experienced strong anger as a result of Monsignor Ryan’s alleged sexual abuse, to the point of expressing that anger by urinating on Monsignor Ryan’s motel room bed, this does not rise to the level of “appreciable harm” necessary to trigger the statute of limitations. As in Ross, a rational fact-finder could conclude that Mr. Carney’s anger was due to his sense that Monsignor Ryan’s conduct was socially unacceptable and a breach of the tenets of the Church; indeed, Mr. Carney may well have recognized Monsignor Ryan’s alleged abuse to be an egregious violation of trust. Dr. Alan Nineberg, M.D., performed a psychiatric evaluation of Mr. Carney on October 1, 2002 and October 8, 2002, and concluded that, in the aftermath of the abuse, “Mr. Ryan felt angry, hurt and betrayed that a priest would do such a thing. He also felt a vague sense of fear that somehow, in the rough and tumble world of high school, that someone would find out about what had transpired between him and the priest.”[4] In his report, Dr. Nineberg also remarked that “[i]t is common among those who have been abused as children and adolescents to avoid the abuser if possible, as a normal visceral response, without any conscious awareness of having been harmed.” In light of this, it would constitute impermissible fact-finding for this court to conclude that Mr. Carney understood at the time of the abuse or soon thereafter that he had suffered appreciable harm.
3. Causal Connection to Monsignor Ryan
Monsignor Ryan also argues that Mr. Carney knew or reasonably should have known that Monsignor Ryan’s alleged acts of abuse caused his injury. In support of this claim, Monsignor Ryan again points to several passages from Mr. Carney’s deposition, including this one;
Q: Did you play hockey that year?
A: I played hockey that year, I tried not to play. Ater a while I blamed it on somebody’s death. I didn’t want to play hockey. The coaches came to the house and they understood. It was too bad that girl died, Maryann, but that wasn’t it. I didn’t want to see my father’s face sitting across the fuckin’ table from Coach Hanson and Coach Greenly and saying the reason I didn’t want to go to school was because of seeing this fuckin’ guy. That was the real reason.
Q: So, after those events you began to get in trouble in school?
A: Yes, I just didn’t want to go to CM. My whole interest, my whole self of being wrapped around that school just dropped off.
Monsignor Ryan argues that this passage, and several others, demonstrate that Mr. Carney knew that the harm he suffered — quitting hockey, leaving CM and giving up his dream of being a professional hockey player — was caused by Monsignor Ryan. In response, Mr. Carney argues that he didn’t begin to apprehend the causal connections between the abuse and the harm that he suffered until he saw Gary Garland and Monsignor Ryan on television in March 2002, one month before he filed this action.
Athough Monsignor Ryan highlights certain passages of Mr. Carney’s deposition to support his argument, the deposition contains numerous passages that indicate that Mr. Carney failed to make a causal connection, prior to March 2002, between the harm he has suffered and the alleged abuse by Monsignor Ryan. In fact, many passages suggest that Mr. Carney is still in the process of drawing connections between the events that took place during his year at Catholic Memorial and the troubles he has suffered in the subsequent years.
Q: When you saw [Monsignor Ryan’s] face on TV [in March 2002] what did you do?
A: I broke down and cried.
Q: Who was there?
A: Terri Martini.
Q: Did you say anything to her or tell her anything? A: Yes.
Q: What did you tell her?
A: I told her he did it to me.
Q: As a result of that what did you do, if anything, after seeing his face on TV?
A: Actually, on that day we were taking my dad out for his birthday party and didn’t do anything.
Q: Do you want to take a break?
A: No I don’t.
*7 Q: Okay.
A: I waited. I didn’t want to blow my father’s birthday party. We went to the Chateau in Norwood to eat. I couldn’t sit there so I ran out into the parking lot and my sister came out and my brother-in-law and Terri. I don’t know if she had told them or whatever. My sister asked me what was the matter and I told her. We went to Terri’s mother’s house and I wasn’t sure if I wanted to call Gary or not but I did and he came right over.
Q: Tell us everything that you remember happening when Gary Garland came to your girlfriend’s mother’s house?
A: He came over and I was pretty much in a mess, I was drinking like a fish. He asked me what happened and I told him.
Q: What else?
A: That was it. I just proceeded to get drunk and cry my eyes out and share my pain and everything that I have gone through in my life and what he has gone through because we hadn’t seen each other in many years. It was just, you know, what has been going on in your life and how much hell has it been and, you know, drink is not the answer.
Q: Why did you wait 20 years to complain about a crime?
A: Because I think I had shoved it down so far and then something jogs your memory and it brings little things back in your belly and the pain comes a little bit and you can’t seem to swallow it anymore.
Dr. Nineberg’s report concerning his psychiatric evaluation of Mr. Carney further indicates that, in the years following the alleged abuse, Mr. Carney did not connect his problems to the actions of Monsignor Ryan:
[Mr. Carney] never considered telling anyone [about the abuse], and tried to put the events out of his mind. In the ensuing days and weeks, he thought less and less about the events. Over the coarse of years, he was aware of his many problems, but did not connect these with Monsignor Ryan. Several times a year, something about the abuse might pop into his head, and for a brief period make him feel sad. However, for the most part, his life was a “fast moving train” involving drugs and alcohol.
After seeing Monsignor Ryan on television, however, Mr. Carney no longer “pushed down” the abuse:
[After seeing Monsignor Ryan on television, Mr. Carney] told several family members of this molestation. At the time, he had this “shit feeling” the same way he felt when the abuse was taking place, like he was “right there again”... He felt extremely angry, and even had momentary thoughts of murder. He also had some feelings of taking his own life. He cried a lot, sweat a lot, had difficulty sleeping, and couldn’t get Monsignor Ryan’s face out of his head for many weeks. Since this period of time, the acute reactions have certainly subsided. However, he remains preoccupied with the memory of the abuse and the knowledge of its effects on him . . . On the other hand, it has also been in some respects a relief to connect aspects of his long-term functioning and perceived failures to the abuse he suffered.
In Ross, the Supreme Judicial Court declined to find that a reasonable person in the plaintiffs position would have drawn a causal connection between the difficulties in his life and the abuse that took place decades before. The court noted that there were other aspects of the plaintiffs history, including drug and alcohol abuse in his early adolescence, that the plaintiff might reasonably have surmised to be the cause of his problems. “These reasons, together with the plaintiffs psychological coping mechanisms prevent us from concluding that, as a matter of law, the plaintiff knew or should have known that he suffered harm caused by the defendant to trigger the statute of limitations.” Ross at 366.
Similarly, in Gagne v. O’Donoghue, Worcester Superior Court, No. Civ. A. 941158, 1996 WL 1185145, 5 Mass. L. Rptr. 501 (June 26, 1996), cited in Ross, 433 Mass. at 366, the plaintiff, who had been sexually assaulted many years before filing his action, argued that he did not realize that “his difficulty maintaining relationships, his fear of authority figures, and his guilt” were causally related to the assaults until he entered therapy in 1991. Id. at *3. The plaintiffs argument was supported by a statement from his treating therapist. Although the plaintiff acknowledged that he had previously told his mother and his therapist that the memory of the assaults made him feel “sick and embarrassed,” he stated that he did not consider bringing a lawsuit against any of the defendants until June 1991. The court held that a genuine issue of material fact existed as to when the plaintiff knew or should have known that his psychological injuries were caused by the defendants’ conduct.
As in Ross and Gagne, Mr. Carney remembered the abuse and was plagued by negative feelings in the years that followed. However, he did not consider filing a lawsuit against Monsignor Ryan until March 2002:
Q: When did you decide to bring this lawsuit, Mr. Carney?
A: The day I spotted his face on TV
Q: “His” meaning [who]?
A: Who are we talking about?
Q: Monsignor Ryan?
A: Yes.
Q: Was that in connection with some case?
A: I saw his face on TV and that was enough for me to come forward with this case
*8 Although some courts have granted summary judgment in similar cases, see e.g. Phinney v Morgan, 39 Mass.App.Ct. 202 (1995), the plaintiffs in those cases demonstrated a clear understanding of the harm caused by the abuse more than three years before filing their lawsuits. For example, in Phinney, one plaintiff ran away from home on three occasions to avoid the abuse; both plaintiffs had discussed filing a lawsuit against their abuser four years earlier. See Ross at 365-66 (in cases where summary judgment was granted, “the alleged injuries were more extensive and tangible than the shame and sense of wrong that are involved here”). In this case, although Mr. Carney suffered feelings of anger during and after the abuse, he “pushed it down,” did not tell anyone (including his fiancee) about it, and did not consider filing a lawsuit against Monsignor Ryan. All of that changed in March 2002, when Mr. Carney saw Monsignor Ryan’s face on television; at that point, Mr. Carney became extremely upset, told his fiancee and family about the alleged abuse, and decided to file this action.
“Ordinarily when a plaintiff knew or should have known of [his] cause of action is a factual issue to be decided by a trier of fact.” Riley v. Presnell, 409 Mass. 239, 240 (1991). Mr. Carney’s deposition does not, as Monsignor Ryan claims, clearly illuminate the time frame during which Mr. Carney understood that he had sustained an injury to his psyche caused by Monsignor Ryan. To the contrary, the deposition offers some evidence that Mr. Carney did not begin to grasp that causal connection until March 2002, and is still discovering, with the assistance of therapists, the depth and breadth of that connection. Because a genuine issue of material fact exists with respect to when Mr. Carney knew, or reasonably should have known, that he suffered appreciable harm caused by Monsignor Ryan’s alleged sexual abuse, Monsignor Ryan’s motion for summary judgment is denied.

 The legislature enacted §4C in 1993 in order to extend the discovery rule to sexual abuse cases. The discovery mle provides that “causes of action do not accrue for limitation purposes until the plaintiff knew or should have known that he has been harmed by the defendant’s conduct.” Ross v. Garabedian, 433 Mass. 360, 363 (2001), citing Riley v. Presnell, 409 Mass. 239, 243 (1991), Franklin v. Albert, 381 Mass. 611, 617 (1980).

 Monsignor Ryan has moved to strike the report submitted by Dr. Nineberg. That motion is denied, although this Court does not give any weight to the sections of Dr. Nineberg’s report that constitute legal opinions.